IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| JAMES M. THARPE, JR.,<br><br>*Plaintiff,*<br><br>v.<br><br>RUDY K. LAWIDJAJA,<br><br>*Defendant.* | CIVIL ACTION NO. 6:12-CV-00039<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Seeking damages, injunctive relief, and cancellation and rescission of a purported contract, the instant complaint alleges intentional infliction of emotional distress, fraud in the inducement, tortious interference with contract, and defamation. The crux of the complaint is that Defendant, who resides in Maryland, reached out to harass Plaintiff, who resides in Lynchburg, Virginia, by conducting a campaign of tortious acts in a deliberate attempt to adversely affect Plaintiff's employment in Lynchburg. Defendant removed the case from the Circuit Court for the City of Lynchburg, and then filed a motion to dismiss for improper venue or, in the alternative, to transfer venue to the United States District Court for the District of Maryland or the District of Columbia. The matter was briefed and heard, and at the conclusion of argument I stated that I would deny the motion. This memorandum opinion further explains that venue appropriately lies in this court, and the propriety of retaining venue here.

I.

Rule 12(b)(3) of the Federal Rules of Civil Procedure provides that a party may assert improper venue as a defense. As I will explain later in this memorandum opinion, Defendant's

motion to dismiss for improper venue is unfounded, as venue in this instance is based on 28 U.S.C. § 1441(a), which provides that a civil action filed in state court may be removed "to the district court of the United States for the district and division embracing the place where such action is pending." However, Defendant moves in the alternative to transfer venue pursuant to 28 U.S.C. § 1404(a), which provides that, even when venue is proper, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Ordinarily, "[v]enue is based on the facts alleged in the well-pleaded complaint," *Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1410 (Fed. Cir. 1996) (citations omitted), and, given that Defendant bears a "heavy burden in opposing the plaintiff's chosen forum," *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007), and the "strong presumption in favor of the plaintiff's choice of forum," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 265-66 (1981), I will review the facts in the light most favorable to Plaintiff. *See Innovative Communications Technologies, Inc. v. Vivox, Inc.*, Civil Action Nos. 2:12-cv-7, 2:12-cv-8, & 2:12-cv-9, 2012 WL 4738979, *4 (E.D. Va. October 3, 2012) ("[f]or the purposes of these motions [to transfer venue in three cases that were consolidated], the Court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" (quoting *Combs v. Bakker*, 886 F. 2d 673, 676 (4th Cir. 1989))); *see also Aggarao v. MOL Ship Management Co., Ltd.*, 675 F.3d 355, 366 (4th Cir. 2012) (on a Rule 12(b)(3) motion, "[a] plaintiff is obliged . . . to make only a prima facie showing of proper venue," and "[i]n assessing whether there has been a prima facie venue showing, we view the facts in the light most favorable to plaintiff" (citations omitted)); *Kelly v. Ammado Internet Services, Ltd.*, Civil Action

No. 3:12-cv-291, 2012 WL 4829341, *1 (E.D. Va. October 10, 2012) ("the Court construes in Kelly's favor all allegations and materials offered to establish venue" (citing *Aggarao*, 675 F.3d at 366)).

Defendant is a photographer. Plaintiff posted photographs of himself on a Web-site used by aspiring models to promote themselves, and thereafter, in April or May 2010, Defendant contacted him.[1] In the course of the ensuing acquaintanceship between Plaintiff and Defendant, Plaintiff signed two broad, seemingly boilerplate photographic release agreements, neither of which contains an integration clause nor makes any reference to nudity. Assuming the releases are valid and enforceable, they do not contract for any specific services; rather, they purport to grant to the photographer the rights "to all photographs taken of [Plaintiff] on or between . . . Friday January 1st 2010 and Monday December 31st 2012," and "all photographs or videos taken of [Plaintiff's] person on or between . . . August 15th 2011 and December 31st 2015."[2]

Defendant photographed Plaintiff a number of times (at least once in Lynchburg) and promoted Plaintiff as a model. Eventually, Plaintiff posed nude for Defendant. Plaintiff asserts that he agreed to do so only after Defendant assured Plaintiff that Defendant would not distribute photographs displaying Plaintiff's genitals or buttocks, and exhibits submitted in support of the complaint suggest that Defendant may have given Plaintiff this assurance.

Over time, relations between the parties deteriorated. There were angry scenes and tentative reconciliations between the parties. At least one of the angry scenes between the

---

[1] It appears that Plaintiff lived in Lynchburg at the time.

[2] Plaintiff signed and dated the first release on March 18, 2010, and the second release on October 14, 2011.

parties involved Defendant contacting Plaintiff's mother in Lynchburg. Plaintiff, who works as a soccer coach and was more committed to his employment as a coach than he was to pursuing modeling opportunities, apparently failed to attend some modeling appointments or commitments. More importantly, Plaintiff refused Defendant's request that Plaintiff leave his employment as a coach, relocate to the Washington, DC area, and serve as Defendant's "house model."

During the course of the parties' increasingly strained relationship, Plaintiff moved, in May 2010, to Tennessee to take a one-year coaching job. In May 2011, Plaintiff accepted his current coaching position, which began in July 2011, with Central Virginia United Soccer Club ("CVUS") in Lynchburg.

In August 2011, Plaintiff learned through his employer that an Internet search using Plaintiff's name had returned Web-sites displaying "inappropriate and embarrassing" photographs of which parties associated with CVUS "did not approve." Apparently there was a Web-site, maintained or controlled by Defendant, using Plaintiff's name. Defendant agreed to remove some of the pictures, "but left on the site a photograph which was still objectionable . . . ."

On August 19, 2011, Defendant sent an e-mail to Plaintiff and to Plaintiff's employer, stating his position regarding Plaintiff's request to take down the photographs.[3]

On September 16, 2011, Defendant sent an e-mail to Plaintiff, stating that he had "officially withdrawn" his support for Plaintiff at a modeling agency. Defendant added, "[a]s far

---

[3] A copy of this e-mail is submitted as an exhibit in support of the complaint. Defendant's command of written English is not polished; however, it is clear that he refused to "take down anymore [sic] pictures," and he stated that, were he to receive any further requests regarding the matter, he would "issue and file more Subpoenas, Complaints and Take Down notices."

-4-

as I know you [*sic*] no longer on their website." Defendant concluded the e-mail by telling Plaintiff, "you are a great soccer coach, however, not much on modeling initiatives."

On September 17, 2011, Defendant sent Plaintiff an e-mail directing Plaintiff to stop using Defendant's contact list and to use his own contact resources. The complaint states that "Plaintiff responded to Defendant[,] explaining his reaction to Defendant black listing Plaintiff as a model." That day, the parties continued to exchange e-mails regarding Plaintiff's career choices, with Defendant condemning Plaintiff for refusing to make a greater effort to pursue modeling, yet also condemning Plaintiff's ability to be a model.

Later in September 2011, Defendant called Plaintiff to tell him that one of his clients had requested Plaintiff, and Defendant offered Plaintiff the job. The complaint states that "Plaintiff agreed, as he needed the money; Defendant again began taking photographs of Plaintiff."

According to the complaint, Defendant told Plaintiff that there was a publisher who wanted to do a calendar – apparently of nudes – "and that he would get 20% of the profits."[4] The complaint states that "Defendant said the theme was artistic/athletic; however, no genitals would be shown. Plaintiff agreed to the photo shoots with the understanding that no genitals would be shown." In a series of text messages between October 5 and October 13, 2011, Plaintiff asked Defendant to make sure that any photographs of his body below the waist be cropped so as not to show his genitals, but Defendant would give him no such assurances. Plaintiff informed Defendant that he would no longer pose fully nude.

In September and October 2011, Plaintiff grew suspicious that Defendant had placed spyware on Plaintiff's cell phone, allowing Defendant to view text messages and e-mails

---

[4] Whether Plaintiff or Defendant "would get 20% of the profits" is unclear.

exchanged between Plaintiff and Plaintiff's girlfriend. As a result of these suspicions, Plaintiff turned down a modeling opportunity presented to him by Defendant, and Plaintiff "then called Defendant and left a message informing Defendant that Plaintiff believed he had installed spyware on his phone, that he could no longer trust Defendant, and that he was finished working for Defendant." The next day, Defendant sent a text message to "Plaintiff's mother and told her to tell Plaintiff never to contact him again." Plaintiff states that he "had no further contact with Defendant until he heard about a cease and desist order . . . and learned further that Defendant had posted one nude photograph [of Plaintiff] on [the] website [that used Plaintiff's name in the address] and other nude photographs [of Plaintiff] on Defendant's [own] website . . . ."

On December 8, 2011, Defendant wrote and sent a purported "cease and desist" letter to Plaintiff and to others at Plaintiff's place of employment.[5] Among other things, the letter airs a number of Defendant's personal complaints about Plaintiff, and includes two appendices cataloguing such complaints.[6]

On December 17, 2011, Plaintiff sent an e-mail to Defendant upon learning that Defendant had posted (on Defendant's Web-site) full nude photographs of Plaintiff, and Defendant had tagged those photographs under the name of Plaintiff's employer, so that any

---

[5] A copy of this letter is attached as an exhibit to the complaint. The letter, which includes ad hominem attacks and irrelevant personal information about Plaintiff, is largely incoherent. It accuses both Plaintiff and his employer of being "disruptive," and of "sabotaging and interfering with [Defendant's] jobs." Among other things, Defendant accuses Plaintiff of "actively breaking commitments and sabotaging [Defendant's] business," *e.g.*, "[m]ultiple last minute shoots cancellation due to [Plaintiff's emplyer's] request[s] for practices or events." And, among other threats, Defendant states that, "as the results [*sic*] of all the actions mentioned in this letter which were taken by both of you," he would "[l]egally exercises [*sic*] all my nuclear options against" Plaintiff and Plaintiff's employer. The complaint states that "[a]ll demands in the cease and desist letter to Plaintiff were followed by Plaintiff," but it is hard to determine exactly what actions Plaintiff might have taken to comply with the letter, other than return photographs to Defendant.

[6] For example, "Appendix A" indicates that, among other things, Plaintiff was out with a woman "instead of preparing for the casting with" Defendant.

-6-

Google search for CVUS would return the nude photographs of Plaintiff. Plaintiff asked Defendant to "please" remove the photographs for the sake of Plaintiff's future as a soccer coach. Plaintiff went to pains to wish Defendant well, and stated that all Plaintiff wished to do was to get on with his life. Later that evening, Plaintiff called Defendant and left a voice-mail asking Defendant to remove the photographs from the Web-site.[7]

On December 18, 2011, Plaintiff again e-mailed Defendant, asking Defendant to take down all of the photographs showing Plaintiff's "genitals and butt," and reminding Defendant that he had verbally agreed to never release any nude photographs of Plaintiff. Plaintiff added that Defendant had not only released several photographs, but that Defendant had also tagged CVUS in those photographs, even though CVUS was in no way connected to Plaintiff's modeling or Defendant's photography, "'and therefore is only tagged to get me caught and henceforth fired from my job." Plaintiff also pointed out that "one of the photos has a photoshopped erect penis, which furthermore depicts me in a negative fashion," and stated his view that Defendant's actions were "a malicious attack for me to lose my job and jeopardize my future as a coach and any other jobs I may pursue."

Copying Plaintiff and others at Plaintiff's place of employment, Defendant forwarded this e-mail to a lawyer who was apparently representing him at the time. The attorney, Mr. Arnold Lutzker (who does not represent Defendant before this court), replied to Plaintiff, asking Plaintiff to "please communicate with me as his attorney as we attempt to resolve this matter," and stating that the attorney would "encourage [Defendant] to reach an understanding with you and provided there is both *mutuality and full follow through on your part*, I believe he can be

---

[7] Among other things statements in this e-mail, Plaintiff thanked Defendant for "open[ing] [Plaintiff's] eyes even wider to the gay culture and the struggle [Defendant] and others are going through with deportation issues."

convinced to take such *steps he believes useful* to facilitate that understanding." (Emphasis added.)

In an e-mail dated December 20, 2011, Plaintiff replied as follows:

Mr. Lutzker,

I appreciate your e-mail. Please be aware that your client, Rudy K, is posting full frontal nude photos of me on his website. We have a verbal agreement for such nudity never to be published. In addition, Rudy K has photoshopped an erect penis on some of the photos, which portrays me negatively. Not only has he done all of the above, he has tagged the pictures under my soccer club's name and position with the club. Doing this causes my naked photo to appear when googling the image of the club. My club has nothing to do with modeling or Rudy K's photography, and he knows that such photos are detrimental to my position at the club, as we had a similar incident a few months ago. He is doing this maliciously to cause me to lose my job and will be detrimental to my future career as a coach and in other professions I may choose.

I do apologize that my actions would cause Rudy such hurt that he feels the correct action would be one that would tarnish my career. I never did anything intentionally, and Rudy always knew that my coaching took priority over modeling. He had dropped me a couple times in the past as a model for conflicting issues, and he pursued to get me back, which is simply bad business on his part knowing my limitations. I have e-mails to prove such. Despite the Model Release I signed, I never signed a contract where I was obligated in such ways to make Rudy K financial gains. I never received a copy of the Model Release, and I request to have one sent to me. If not, it will be subpoenaed if the matter goes further.

Rudy K contacted my mother several weeks ago to never have me contact him again. I adhered to that, as how things ended with us did not warrant me to want to speak to him again. If such a request, why perform such actions that would make an interaction a must? I understand I was a disappointment in Rudy's eyes, but I do not think it is illegal to be a bad model. I have sent you all the printed materials I have in my possession, have taken down all the photographs taken by Rudy K on Facebook, and have deleted my domain name account for my website, as well as deleting all photos from my computer.

I do not wish to have this matter go further; however if Rudy K persists such malicious material of myself with the purpose of getting me fired and tarnishing my reputation and career as a soccer coach, I will take necessary actions. I request Rudy uphold our verbal agreement to never publish any full nudity photos of myself and take down the ones on his website. I wish for this matter to be

resolved as quickly as possible.

In a follow-up e-mail dated December 21, 2011, , Plaintiff asked Lutzker, "What does Rudy K want? I received a text stating 'There is one thing you can do in person amp [*sic*] will amend the situation for all parties as well as saving your future.'"

Beginning in January 2012, e-mails were exchange and meetings were held to try to resolve the issues between the parties, in particular Plaintiff's demand that Defendant remove all of the frontal nude photographs from his Web-site, and Defendant's demand for consideration before he would remove the photographs.

In an e-mail exchange dated January 18, 2012, Plaintiff asked Lutzker when they could have a discussion to try to resolve the situation. Lutzker replied, "I think the best thing to do first is for you to try to work this out directly with Rudy. *You should particularly be thinking what you can offer him in return for what you want from him.*" (Emphasis added.)

Also on January 18, 2012, Defendant wrote an e-mail message to Plaintiff expressing his dissatisfaction with Plaintiff, apparently borne of resentment Defendant felt for having made gifts or loans to Plaintiff. The message included the following: "Gee even your own mother either cant remember or don't want to say what she has told me. *With the rate this is going I might as well unblock everything and posted more pictures as usual.*" (Emphasis added; otherwise quoted verbatim.)

In an e-mail message dated February 8, 2012, stating in the subject line, "This is non negotiable," Defendant sent to Plaintiff a demand outlining what he wanted from Plaintiff in exchange for taking any steps to attempt to remove the nude photographs. First, Defendant demanded that Plaintiff "[a]ctivate [his] website," and Defendant provided specific instructions how to do so. Then, Defendant directed that Plaintiff was to "start blogging till end of

-9-

Case 6:12-cv-00039-NKM-RSB   Document 16   Filed 10/26/12   Page 9 of 19   Pageid#: 390

September 2012 with a t least 3 posting a month," adding that "[t]he posting may not contain anything that show hates/discrimination towards LGBT community and fashion/modeling." (Bracketed insertion added; otherwise verbatim.) Defendant ordered Plaintiff "to tell [Plaintiff's employer] today That You are back into modeling and will do/aiming for September fashion week 2012 to FINISH what you STARTED." (Bracketed insertion added; otherwise verbatim.) Defendant repeated that his demands were non-negotiable, and that Plaintiff had until 5:00 p.m. that day to meet his demands, or Defendant would "not do anything."

Also on February 8, 2012, Defendant sent Plaintiff a series of text messages that included the following statement: "Read the email I just sent and its non negotiable. Its only valid for google cache problem." (Verbatim quote.) Another message from Defendant stated, "Maybe when you lost ur job and move out of lynchburg good for everyone. That way nobody win. At the moment u , bren and cvu have everything to gain from m e helping you. That's [a]ll I'm gonna say[.]" (Bracketed insertions added; otherwise verbatim.) When Plaintiff responded, "That is fucked up that you want me to lose my job," Defendant replied, "Lost, quit, move or whateveru call it. so nobody win." (Verbatim quote.) Defendant sent other messages stating the following: "Mark my word, even after google finish clearing the cache and cvu still letting u go, u gonna react differently"; "Again I'm sorry for snapping at u today and *threatening to put the pictures back up*. No excuses just apology[.]" (Emphasis and bracketed insertion added; otherwise verbatim.)

On February 9, 2012, Defendant sent Plaintiff an e-mail reiterating his demands from the day before, *e.g.*, stating "[n]ow show me something that you support me and trying to make this Fashion week not as painful. And this support need to be directed to my industry." (Bracketed insertion added; otherwise verbatim.)

On February 14, 2012, Plaintiff e-mailed Defendant, stating that Defendant's posting the nude photographs on various Web-site had "been one of [Plaintiff's] worst nightmares." Plaintiff informed Defendant that he was finished with modeling and that he would have no further contact with Defendant. Ex. R.

On February 14, 2012, Defendant responded by e-mail that included the following statement: "As we discussed over the phone on February 12th, 2012 at 11.30 pm as well as your email, dated 02/12/2012, you stated that you 'can't and won't do things you don't want to do,' I am responding in likeness." (Verbatim quote.) Defendant also wrote the following:

> The fact that you can't even follow through on anything or do what you said you would do, in essence reversing your action – I am reversing all my actions as well. After that I will not do anything until I receive offers from you which are comparable to what you are asking of me. It is now your responsibility to arrange propositions that will entice me into agreement. I refuse to continue in any further discussions with you concerning your pictures until these conditions are met and your obligation fulfilled.

The complaint alleges that, "in March/April 2012, Defendant created three more websites in Plaintiff's name," and posted on those Web-sites nude photographs of Plaintiff, "some of which had been edited" to depict Plaintiff with a tumescent penis or ejaculating. Plaintiff adds that the Web-sites also promote photographs that are password-protected, that nude photographs of Plaintiff have been posted on other Web-sites, and that nude photographs posted on the Internet have been tagged with the name of Plaintiff's employer.

Plaintiff also alleges his belief that, "under fictitious names," "Defendant composed and sent a series of e-mails to" several youth soccer associations, and that "[t]hese e-mails were sent maliciously and with the intent to have Plaintiff's employer terminate his employment and to
-11-

embarrass and humiliate Plaintiff. . . ."[8]

## II.

### A.

As I have already mentioned, Plaintiff is a resident of Virginia, and Defendant is a resident of Maryland. Plaintiff's intentional infliction of emotional distress claim seeks $1,000,000 in compensatory damages, and $350,000 in compensatory damages. His tortious interference with contract claim seeks "a judgment against Defendant for $100,000.00, [and] punitive damages of $350,000.00." His defamation claim seeks "a judgment against Defendant in the amount of $500,000.00 compensatory damages, and] $350,000.00 [in] punitive damages." Because this is a "civil action where the matter in controversy exceeds the sum or value of $75,000, . . . and is between . . . citizens of different states," it is a case where "[t]he district courts . . . have original jurisdiction," 28 U.S.C. § 1332(a)(1), and thus it was removed here pursuant to 28 U.S.C. §§ 1441(a) & 1446.

Moving to dismiss, Defendant contends that "venue for Plaintiff's action does not properly lie with this court pursuant to" the rules stated in 28 U.S.C. § 1391(b), which is subtitled "**Venue in general.**" However, "venue for actions brought in state court and later removed to federal court is governed by 28 U.S.C. § 1441(a), and not the general venue rules found in 28 U.S.C. § 1391." *McPhearson v. Anderson*, ___ F. Supp. 2d ___, ___, 2012 WL 2819273, at *3 (E.D. Va. July 6, 2012) (citation omitted); *see also Polizzi v. Cowles Magazines*,

---

[8] Copies of these e-mails have been submitted as exhibits in support of the complaint. I make no finding of fact regarding the origin of these e-mails, but I note in passing that they are strikingly similar to other writings attributed to Defendant that have been submitted in support of the complaint.

-12-

Case 6:12-cv-00039-NKM-RSB   Document 16   Filed 10/26/12   Page 12 of 19   Pageid#: 393

*Inc.*, 345 U.S. 663, 665–66 (1953) ("on the question of venue, § 1391 has no application to this case because this is a removed action. The venue of removed actions is governed by 28 U.S.C. . . . § 1441(a), . . . and under that section venue was properly laid in the . . . district embracing Dade County, the place where this action was pending" before removal from state court). Section 1441(a) provides that,

> [e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

Defendant does not raise any dispute regarding this court's jurisdiction. Indeed, Defendant's own notice of removal in this case states that "[t]his action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332," that Defendant sought removal "pursuant to the provisions of" § 1441, "that it is a civil matter between citizens of different states," and "that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs." Accordingly, venue is appropriate here, as this case was originally filed in the Circuit Court for the City of Lynchburg, and the Lynchburg Division of the United States District Court for the Western District of Virginia is "the district and division embracing the place where" the suit was pending. 28 U.S.C. § 1441(a).

### B.

Defendant moves in the alternative to transfer the case, pursuant to 28 U.S.C. § 1404(a), to the District of Maryland or the District of Columbia. A court may transfer a case "for the convenience of the parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). When deciding a motion to transfer, a district court must "weigh in the balance the convenience of the witnesses and those

-13-

Case 6:12-cv-00039-NKM-RSB   Document 16   Filed 10/26/12   Page 13 of 19   Pageid#: 394

public interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Id.* at 29 (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964). The burden is on the moving party to show that transfer to another forum is proper. *Kontoulas v. A. H. Robins Co., Inc.*, 745 F.2d 312, 315 (1984) ("[t]he only question for us to decide is whether . . . the defendants met their burden of showing not only that Maryland was not the best forum, but that a particular other forum was *more appropriate*").

A plaintiff's choice of forum is typically entitled to considerable deference, especially when the suit is filed "in the district and division in which [the plaintiff] resides."[9] *Glamorgan Coal Corp. v. Ratners Grp., PLC*, 854 F. Supp. 436, 437 (W.D. Va. 1993) (citing *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)). Indeed, to defeat the plaintiff's choice a defendant must normally show that "the balance of equities is in [his or her] favor [and] that judicial economy and convenience to all parties favor suit in another forum." *Id.* at 437–48 (quoting *Eldridge v. Bouchard*, 620 F. Supp. 678, 684 (W.D. Va. 1985)); *see also Akers v. N&W Ry. Co.*, 378 F.2d 78, 80 (4th Cir. 1967) (noting the plaintiff has "the primary right . . . to choose his forum," and that selection is "not easily to be overthrown"). Unless the balance of factors "'is *strongly* in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984) (quoting *Gulf Oil Corp.*

---

[9] Significantly, a plaintiff is entitled to rely on the normal operation of § 1441(a). When Plaintiff filed his case in the Circuit Court for the City of Lynchburg against a diverse Defendant, he must have foreseen the possibility that Defendant would remove the case to federal court. By operation of § 1441(a), removal is thus automatically to the Lynchburg Division of the Western District.

*v. Gilbert*, 330 U.S. 501, 508 (1947)).

The statutory factors to consider in evaluating a motion to transfer are quite general, raising "two inquiries: (1) whether the claims could have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." *Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 2d 627, 630 (E.D. Va. 2003). Some of the factors relevant to a *forum non conveniens* determination are also relevant to determinations of a motion to transfer venue pursuant to § 1404(a), although under § 1404(a) "the discretion to be exercised is broader." *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955). The relevant *forum non conveniens* factors include the following:

> (1) the plaintiff's choice of forum; (2) the relative ease of access to sources of proof; (3) the availability of compulsory process for attendance of unwilling witnesses; (4) the cost of obtaining attendance of willing witnesses; (5) the possibility of viewing premises, if applicable; (6) all other practical problems that make trial of a case easy, expeditious, and inexpensive; and (7) factors of public interest, including the relative congestion of court dockets and a preference for holding a trial in the community most affected.

*Terry v. Walker*, 369 F. Supp. 2d 818, 822 (W.D. Va. 2005) (citing *Gilbert*, 330 U.S. at 508–09). These factors have been found to dovetail with the interest of justice factor, which is a purposely broad category that takes into account all other factors other than convenience and the parties' initial choice of venue, *Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1256 (E.D. Va. 1988), including, for example, "the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, [and] the possibility of unfair trial . . . ." *Koh*, 250 F. Supp. 2d at 639.

The parties do not dispute that Defendant is a resident of Maryland, and Plaintiff could

Case 6:12-cv-00039-NKM-RSB   Document 16   Filed 10/26/12   Page 15 of 19   Pageid#: 396

have filed the complaint in Maryland.[10] However, the interest of justice consideration weighs heavily against transferring the complaint to Maryland, because it would be unjust to require Plaintiff to travel to Maryland to assert tort claims under Virginia law regarding Defendant's alleged acts against Plaintiff that occurred in Virginia and were deliberately directed at a Virginia audience in an attempt to affect Plaintiff's employment in Lynchburg, Virginia.

As for Defendant's contention that witnesses he may call in his defense are located in Maryland, the District of Columbia, and New York, Plaintiff counters that the Lynchburg Division of the Western District of Virginia is more convenient to his witnesses. "Neither party provides the 'requisite particularity' about the expected witnesses and their potential testimony . . . ." *Affinity Memory & Micro v. K & Q Enterprises, Inc.*, 20 F. Supp. 2d 948, 955 (E.D. Va. 1998) (quoting *Baylor Heating*, 702 F. Supp. at 1258). However, where "the original forum is convenient for plaintiff's witness, but inconvenient for defendant's witnesses, and the reverse is true for the transferee forum . . . transfer is inappropriate because the result of transfer would serve only to shift the balance of inconvenience." *Baylor Heating*, 702 F. Supp. at 1258. *Baylor Heating* also stated that

> [w]itness convenience is often dispositive in transfer decisions. But the influence of this factor cannot be assessed in the absence of reliable information identifying the witnesses involved and specifically describing their testimony. This type of particularized information, typically submitted in affidavit form, is necessary to enable the court to ascertain how much weight to give a claim of inconvenience.

---

[10] Defendant also suggests that venue could lie in the District of Columbia, asserting that one of the model releases was executed there and that about 22 percent of the photographs and videos Defendant made of Plaintiff were shot in the District, and that determination of Plaintiff's claims will depend on interpretation of District of Columbia law. To be sure, it is possible that determination of Plaintiff's request for cancellation and rescission of a purported contract will turn on District of Columbia law; however, Plaintiff's tort claims, *i.e.*, the very essence of the complaint, arise under Virginia law. Regarding Defendant's claim that his witnesses reside in Maryland, the District of Columbia, and New York, Defendant has not provided "the requisite particularity about the expected witnesses and their potential testimony" for that assertion to be given much weight. *Affinity Memory & Micro v. K & Q Enterprises, Inc.*, 20 F. Supp. 2d 948, 955 (E.D. Va. 1998).

-16-

> Inconvenience to a witness whose testimony is cumulative is not entitled to greater weight. By contrast, greater weight should be accorded inconvenience to witnesses whose testimony is central to a claim and whose credibility is also likely to be an important issue.

*Id.* In this matter, except for Defendant's identification of one potential, named witness who executed an instrument summarily stating that "he reside[s] and work[s] in the state of Maryland" and that Plaintiff "contacted [him] to testify against" Defendant, Defendant has provided no specific information whatsoever about his expected witnesses in Maryland, the District of Columbia, and New York City, and their potential testimony.[11] As a result, consideration of the convenience of the parties and witnesses does not support a decision to transfer this action.

Plaintiff's choice of forum weighs heavily against a transfer to Maryland or the District of Columbia. Plaintiff resides in Virginia and filed this suit in the Circuit Court for the City of Lynchburg to force Defendant to cease committing tortious acts against Plaintiff in Virginia. Defendant contends that venue should lie elsewhere because most of the photographs were taken in Maryland or the District, and very few of the photographs were taken in Virginia. Defendant also purports that the model release agreements are contracts that must be interpreted under the laws of Maryland and District of Columbia. But Defendant obscures the point. Plaintiff asserts

---

[11] Defendant's affidavit simply names nineteen people and says they are potential witnesses. Defendant does not state how these nineteen people or any testimony they may provide are related to Plaintiff's claims. Most of Defendant's affidavit is irrelevant to the question of venue, as indicated for example in the following statements about Plaintiff: Plaintiff "exhibited a preference of alcohol and chased girls during business functions and while at work"; Plaintiff "intentionally engaged in behavior destructive to my business, disparaging to both my reputation and sabotaging my business , i.e., by negative contacts with editors and other professionals"; Plaintiff's "conduct and behavior during business events, functions was frequently unprofessional and full of broken promises"; Plaintiff "eagerly collected payment and perks associated with modeling, but often failed to show for work"; and Plaintiff "engaged in unsavory behavior, which reflects poorly on a person charged with interacting, coaching and mentoring young children." (Verbatim quotes.) Yet the exhibits submitted in support of the complaint suggest that Defendant pursued a relationship with Plaintiff at least into mid-February of this year.

tort claims under Virginia law regarding Defendant's acts that were directed at a Virginia audience in a deliberate attempt to derail Plaintiff's employment opportunities in Virginia. It does not matter where the photographs were actually shot, and whether the release agreements provide a defense to Defendant's conduct is Defendant's burden to establish, whether in Virginia, Maryland, or the District of Columbia. Accordingly, Plaintiff's preference for a Virginia forum is entitled to substantial weight, especially given that it is his home forum and it bears a substantial relation to the cause of action. *See Koh*, 250 F. Supp. 2d at 633; *see also Heinz Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660, 667 (E.D. Va. 2010).

Considering the relative ease of access to sources of proof, Plaintiff states that all of his witnesses live in or near Lynchburg, and

> will include (a) officers and directors of CVUS, all of whom have seen the erotic pictures of the plaintiff which defendant placed on the internet; (b) parents of CVUS youth soccer players who have seen these photos; (c) plaintiff's physician; (d) plaintiff's mother; (e) other soccer coaches who have seen these photos of plaintiff; and (f) other persons not yet identified as to plaintiff's reputation in the Lynchburg community.

In comparison, Defendant simply names nineteen people and says they are potential witnesses. He does not state how they are related to Plaintiff's claims.

Compulsive process is available for plaintiff's witnesses. If Defendant has relevant witnesses and he is unable to compel their personal attendance, he may be forced to raise his defense through deposition testimony, but, as I have already mentioned, that is not a reason to merely "shift the balance of inconvenience." *Baylor Heating & Air Conditioning*, 702 F. Supp. at 1258. Nor is the cost of obtaining the attendance of willing witnesses or the deposition testimony for unwilling witnesses sufficient to justify shifting the balance of inconvenience. Moreover, as I have also already mentioned, Defendant has not produced "reliable information

Case 6:12-cv-00039-NKM-RSB   Document 16   Filed 10/26/12   Page 18 of 19   Pageid#: 399

identifying the witnesses involved and specifically describing their testimony." *Id.*

As for the possibility of viewing premises, there are no premises to be viewed. Neither party has suggested that any physical location is relevant from an evidentiary standpoint.

Finally, the public interest weighs against a transfer to Maryland. There is little reason to believe that a denial of transfer will result in prejudice or delay to the parties; rather, I can resolve the matter in an expeditious fashion, as the docket in this court is not congested. In addition, should the matter turn to questions of Maryland or District of Columbia contract law, that is not an area of law that is overly complex or requires a local court's resolution. As such, I find that the public interest is served better if the request to transfer is denied.

In sum, the relevant factors weigh heavily against the transfer of this action.

### III.

For the reasons stated at the conclusion of the hearing on the instant motion and explained further herein, the motion to dismiss for improper venue or, in the alternative, to transfer venue, is denied. An appropriate order accompanies this memorandum opinion.

Entered this 26th day of October, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE