JAMES M. THARPE, JR.,

        *Plaintiff,*

    v.

RUDY K. LAWIDJAJA,

        *Defendant.*

CIVIL ACTION No. 6:12-CV-00039

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

For the reasons stated herein, I will deny Defendant's motion for partial summary judgment, and I will dismiss his counterclaims without prejudice for lack of subject-matter jurisdiction.[1]  Additionally, Defendant's counsel's renewed motion to withdraw will be denied, without prejudice, and Plaintiff's motion to set this case for a bench trial will be granted. Additionally, I will deny Defendant's motions, filed by counsel long after filing counsel's renewed motion to withdraw, seeking to exclude or limit testimony presented by Plaintiff's physician and expert witness.

**I.**

*A.*

Seeking damages, injunctive relief, and cancellation and rescission of a purported contract, Plaintiff filed a complaint alleging intentional infliction of emotional distress, fraud in the inducement, tortious interference with contract, and defamation.  The crux of the complaint

---

[1] The docket reflects that the motion for summary judgment has been submitted for decision on the briefs. *See* docket nos. 47 & 49.  Because I am dismissing the counterclaims, I will not refer to the counter-parties.  Mr. Tharpe is Plaintiff, and Mr. Lawidjaja is Defendant.

is that Defendant, who resides in Maryland, reached out to harass Plaintiff, who resides in Lynchburg, Virginia, by conducting a campaign of tortious acts in a deliberate attempt to adversely affect Plaintiff's employment in Lynchburg. Defendant removed the case from the Circuit Court for the City of Lynchburg, and then filed a motion to dismiss for improper venue or, in the alternative, to transfer venue to the United States District Court for the District of Maryland or the District of Columbia. The matter was briefed and heard, and at the conclusion of argument I stated that I would deny the motion. Thereafter, on October 26, 2012, I issued a memorandum opinion further explaining that venue appropriately lies in this court, and the propriety of retaining venue here.

Subsequently, Defendant filed an answer and counter-complaint, alleging "a copyright infringement action" and "a Tortious Interference with Contract Expectancy and Prospective Business Relationship action." Defendant has changed counsel twice (he is currently represented by his third set of counsel in this case), and the scheduling order in the case has been amended several times. Defendant filed a motion for partial summary judgment, which has been fully briefed, and Defendant has filed a notice indicating that he has waived any request for oral argument on the motion.

Plaintiff has filed a "motion to schedule case for trial without jury," and Defendant's counsel has filed a renewed motion to withdraw as counsel for Defendant based on "counsel's continuing inability to communicate fully and effectively with Defendant" and "Defendant's failure substantially to fulfill an obligation to counsel regarding their services as required by the signed retainer agreement . . . ." Nonetheless, counsel for Defendant continues to file motions on Defendant's behalf, including two pending motions seeking to exclude or limit testimony presented by Plaintiff's physician and expert witness.

*B.*

With some few additions and annotations, I repeat the summary of Plaintiff's factual allegations that I stated in my memorandum opinion of October 26, 2012.

Defendant's motion states that he is a "commercial and fine art photographer with fifteen years of work in the fashion industry and in photojournalism."[2]  Plaintiff posted photographs of himself on a Web-site used by aspiring models to promote themselves, and thereafter, in April or May 2010, Defendant contacted him.[3]  In the course of the ensuing acquaintanceship between Plaintiff and Defendant, Plaintiff signed two broad, seemingly boilerplate photographic release agreements, neither of which contains an integration clause, makes any reference to nudity, or recites with any specificity the supposed "valuable consideration received" by Plaintiff.  The releases do not contract for any specific services; rather, they purport to grant to the photographer the rights "to all photographs taken of [Plaintiff] on or between . . . Friday January 1st 2010 and Monday December 31st 2012," and "all photographs or videos taken of [Plaintiff's] person on or between . . . August 15th 2011 and December 31st 2015."[4]

Defendant photographed Plaintiff a number of times (at least once in Lynchburg) and promoted Plaintiff as a model.  Eventually, Plaintiff posed nude for Defendant.  Plaintiff asserts that he agreed to do so only after Defendant assured Plaintiff that Defendant would not distribute photographs displaying Plaintiff's genitals or buttocks, and exhibits submitted in support of the

---

[2] As discussed elsewhere in this opinion, Defendant's pleadings provide lengthy and detailed admissions that he produced images of Plaintiff that are arguably pornographic.  *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "pornography" as "[m]aterial (such as writings, photographs, or movies) depicting sexual activity or erotic behavior in a way that is designed to arouse sexual excitement").

[3] It appears that Plaintiff lived in Lynchburg at the time.

[4] Plaintiff signed and dated the first release on March 18, 2010, and the second release on October 14, 2011.

complaint suggest that Defendant may have given Plaintiff this assurance.

Over time, relations between the parties deteriorated. There were angry scenes and tentative reconciliations between the parties. At least one of the angry scenes between the parties involved Defendant contacting Plaintiff's mother in Lynchburg. Plaintiff, who works as a soccer coach and was more committed to his employment as a coach than he was to pursuing modeling opportunities, apparently failed to attend some modeling appointments or commitments. More importantly, Plaintiff refused Defendant's request that Plaintiff leave his employment as a coach, relocate to the Washington, DC area, and serve as Defendant's "house model."

During the course of the parties' increasingly strained relationship, Plaintiff moved, in May 2010, to Tennessee to take a one-year coaching job. In May 2011, Plaintiff accepted his current coaching position, which began in July 2011, with Central Virginia United Soccer Club ("CVUS") in Lynchburg.

In August 2011, Plaintiff learned through his employer that an Internet search using Plaintiff's name had returned Web-sites displaying "inappropriate and embarrassing" photographs of which parties associated with CVUS "did not approve." Apparently there was a Web-site, maintained or controlled by Defendant, using Plaintiff's name. Defendant agreed to remove some of the pictures, "but left on the site a photograph which was still objectionable . . . ."

On August 19, 2011, Defendant sent an e-mail to Plaintiff and to Plaintiff's employer, stating his position regarding Plaintiff's request to take down the photographs.[5]

---

[5] A copy of this e-mail is submitted as an exhibit in support of the complaint. Defendant's command of written
(continued...)

On September 16, 2011, Defendant sent an e-mail to Plaintiff, stating that he had "officially withdrawn" his support for Plaintiff at a modeling agency. Defendant added, "[a]s far as I know you [*sic*] no longer on their website." Defendant concluded the e-mail by telling Plaintiff, "you are a great soccer coach, however, not much on modeling initiatives."

On September 17, 2011, Defendant sent Plaintiff an e-mail directing Plaintiff to stop using Defendant's contact list and to use his own contact resources. The complaint states that "Plaintiff responded to Defendant[,] explaining his reaction to Defendant black listing Plaintiff as a model." That day, the parties continued to exchange e-mails regarding Plaintiff's career choices, with Defendant condemning Plaintiff for refusing to make a greater effort to pursue modeling, yet also condemning Plaintiff's ability to be a model.

Later in September 2011, Defendant called Plaintiff to tell him that one of his clients had requested Plaintiff, and Defendant offered Plaintiff the job. The complaint states that "Plaintiff agreed, as he needed the money; Defendant again began taking photographs of Plaintiff."

According to the complaint, Defendant told Plaintiff that there was a publisher who wanted to do a calendar – apparently of nudes – "and that he would get 20% of the profits." The complaint states that "Defendant said the theme was artistic/athletic; however, no genitals would be shown. Plaintiff agreed to the photo shoots with the understanding that no genitals would be shown." In a series of text messages between October 5 and October 13, 2011, Plaintiff asked Defendant to make sure that any photographs of his body below the waist be cropped so as not to show his genitals, but Defendant would give him no such assurances. Plaintiff informed

---

[5](...continued)
English is not polished (Defendant's counter-complaint states that English is his second language); however, it is clear that he refused to "take down anymore [*sic*] pictures," and he stated that, were he to receive any further requests regarding the matter, he would "issue and file more Subpoenas, Complaints and Take Down notices."

Defendant that he would no longer pose fully nude.

In September and October 2011, Plaintiff grew suspicious that Defendant had placed spyware on Plaintiff's cell phone, allowing Defendant to view text messages and e-mails exchanged between Plaintiff and Plaintiff's girlfriend. As a result of these suspicions, Plaintiff turned down a modeling opportunity presented to him by Defendant, and Plaintiff "then called Defendant and left a message informing Defendant that Plaintiff believed he had installed spyware on his phone, that he could no longer trust Defendant, and that he was finished working for Defendant." The next day, Defendant sent a text message to "Plaintiff's mother and told her to tell Plaintiff never to contact him again." Plaintiff states that he "had no further contact with Defendant until he heard about a cease and desist order . . . and learned further that Defendant had posted one nude photograph [of Plaintiff] on [the] website [that used Plaintiff's name in the address] and other nude photographs [of Plaintiff] on Defendant's [own] website . . . ."

On December 8, 2011, Defendant wrote and sent a purported "cease and desist" letter to Plaintiff and to others at Plaintiff's place of employment.[6] Among other things, the letter airs a number of Defendant's personal complaints about Plaintiff, and includes two appendices cataloguing such complaints.[7]

---

[6] A copy of this letter is attached as an exhibit to the complaint. The letter, which includes ad hominem attacks and irrelevant personal information about Plaintiff, is largely incoherent. It accuses both Plaintiff and his employer of being "disruptive," and of "sabotaging and interfering with [Defendant's] jobs." Among other things, Defendant accuses Plaintiff of "actively breaking commitments and sabotaging [Defendant's] business," *e.g.*, "[m]ultiple last minute shoots cancellation due to [Plaintiff's employer's] request[s] for practices or events." And, among other threats, Defendant states that, "as the results [*sic*] of all the actions mentioned in this letter which were taken by both of you," he would "[l]egally exercises [*sic*] all my nuclear options against" Plaintiff and Plaintiff's employer. The complaint states that "[a]ll demands in the cease and desist letter to Plaintiff were followed by Plaintiff," but it is hard to determine exactly what actions Plaintiff might have taken to comply with the letter, other than return photographs to Defendant.

[7] For example, "Appendix A" indicates that, among other things, Plaintiff was out with a woman "instead of preparing for the casting with" Defendant.

On December 17, 2011, Plaintiff sent an e-mail to Defendant upon learning that Defendant had posted (on Defendant's Web-site) full nude photographs of Plaintiff, and Defendant had tagged those photographs under the name of Plaintiff's employer, so that any Google search for CVUS would return the nude photographs of Plaintiff. Plaintiff asked Defendant to "please" remove the photographs for the sake of Plaintiff's future as a soccer coach. Plaintiff went to pains to wish Defendant well, and stated that all Plaintiff wished to do was to get on with his life. Later that evening, Plaintiff called Defendant and left a voice-mail asking Defendant to remove the photographs from the Web-site.[8]

On December 18, 2011, Plaintiff again e-mailed Defendant, asking Defendant to take down all of the photographs showing Plaintiff's "genitals and butt," and reminding Defendant that he had verbally agreed to never release any nude photographs of Plaintiff. Plaintiff added that Defendant had not only released several photographs, but that Defendant had also tagged CVUS in those photographs, even though CVUS was in no way connected to Plaintiff's modeling or Defendant's photography, "'and therefore is only tagged to get me caught and henceforth fired from my job." Plaintiff also pointed out that "one of the photos has a photoshopped erect penis, which furthermore depicts me in a negative fashion," and stated his view that Defendant's actions were "a malicious attack for me to lose my job and jeopardize my future as a coach and any other jobs I may pursue."

Copying Plaintiff and others at Plaintiff's place of employment, Defendant forwarded this e-mail to a lawyer who was apparently representing him at the time. The attorney, Mr. Arnold Lutzker (who does not represent Defendant in this matter), replied to Plaintiff, asking

_____

[8] Among other things statements in this e-mail, Plaintiff thanked Defendant for "open[ing] [Plaintiff's] eyes even wider to the gay culture and the struggle [Defendant] and others are going through with deportation issues."

Plaintiff to "please communicate with me as his attorney as we attempt to resolve this matter," and stating that the attorney would "encourage [Defendant] to reach an understanding with you and provided there is both *mutuality and full follow through on your part*, I believe he can be convinced to take such *steps he believes useful* to facilitate that understanding." (Emphasis added.)

In an e-mail dated December 20, 2011, Plaintiff replied as follows:

Mr. Lutzker,

I appreciate your e-mail. Please be aware that your client, Rudy K, is posting full frontal nude photos of me on his website. We have a verbal agreement for such nudity never to be published. In addition, Rudy K has photoshopped an erect penis on some of the photos, which portrays me negatively. Not only has he done all of the above, he has tagged the pictures under my soccer club's name and position with the club. Doing this causes my naked photo to appear when googling the image of the club. My club has nothing to do with modeling or Rudy K's photography, and he knows that such photos are detrimental to my position at the club, as we had a similar incident a few months ago. He is doing this maliciously to cause me to lose my job and will be detrimental to my future career as a coach and in other professions I may choose.

I do apologize that my actions would cause Rudy such hurt that he feels the correct action would be one that would tarnish my career. I never did anything intentionally, and Rudy always knew that my coaching took priority over modeling. He had dropped me a couple times in the past as a model for conflicting issues, and he pursued to get me back, which is simply bad business on his part knowing my limitations. I have e-mails to prove such. Despite the Model Release I signed, I never signed a contract where I was obligated in such ways to make Rudy K financial gains. I never received a copy of the Model Release, and I request to have one sent to me. If not, it will be subpoenaed if the matter goes further.

Rudy K contacted my mother several weeks ago to never have me contact him again. I adhered to that, as how things ended with us did not warrant me to want to speak to him again. If such a request, why perform such actions that would make an interaction a must? I understand I was a disappointment in Rudy's eyes, but I do not think it is illegal to be a bad model. I have sent you all the printed materials I have in my possession, have taken down all the photographs taken by Rudy K on Facebook, and have deleted my domain name account for my website, as well as deleting all photos from my computer.

I do not wish to have this matter go further; however if Rudy K persists to publish such malicious material of myself with the purpose of getting me fired and tarnishing my reputation and career as a soccer coach, I will take necessary actions. I request Rudy uphold our verbal agreement to never publish any full nudity photos of myself and take down the ones on his website. I wish for this matter to be resolved as quickly as possible.

In a follow-up e-mail dated December 21, 2011, , Plaintiff asked Lutzker, "What does Rudy K want? I received a text stating 'There is one thing you can do in person amp [*sic*] will amend the situation for all parties as well as saving your future.'"

Beginning in January 2012, e-mails were exchange and meetings were held to try to resolve the issues between the parties, in particular Plaintiff's demand that Defendant remove all of the frontal nude photographs from his Web-site, and Defendant's demand for consideration before he would remove the photographs.

In an e-mail exchange dated January 18, 2012, Plaintiff asked Lutzker when they could have a discussion to try to resolve the situation. Lutzker replied, "I think the best thing to do first is for you to try to work this out directly with Rudy. *You should particularly be thinking what you can offer him in return for what you want from him*." (Emphasis added.)

Also on January 18, 2012, Defendant wrote an e-mail message to Plaintiff expressing his dissatisfaction with Plaintiff, apparently borne of resentment Defendant felt for having made gifts or loans to Plaintiff. The message included the following: "Gee even your own mother either cant remember or don't want to say what she has told me. *With the rate this is going I might as well unblock everything and posted more pictures as usual*." (Emphasis added; otherwise quoted verbatim.)

In an e-mail message dated February 8, 2012, stating in the subject line, "This is non negotiable," Defendant sent to Plaintiff a demand outlining what he wanted from Plaintiff in

exchange for taking any steps to attempt to remove the nude photographs. First, Defendant demanded that Plaintiff "[a]ctivate [his] website," and Defendant provided specific instructions how to do so. Then, Defendant directed that Plaintiff was to "start blogging till end of September 2012 with [at] least 3 posting a month," adding that "[t]he posting may not contain anything that show hates/discrimination towards LGBT community and fashion/modeling." (Bracketed insertions added; otherwise verbatim.) Defendant ordered Plaintiff "to tell [Plaintiff's employer] today That You are back into modeling and will do/aiming for September fashion week 2012 to FINISH what you STARTED." (Bracketed insertion added; otherwise verbatim.) Defendant repeated that his demands were non-negotiable, and that Plaintiff had until 5:00 p.m. that day to meet his demands, or Defendant would "not do anything."

Also on February 8, 2012, Defendant sent Plaintiff a series of text messages that included the following statement: "Read the email I just sent and its non negotiable. Its only valid for google cache problem." (Verbatim quote.) Another message from Defendant stated, "Maybe when you lost ur job and move out of lynchburg good for everyone. That way nobody win. At the moment u , bren and cvu have everything to gain from [me] helping you. That's [a]ll I'm gonna say[.]" (Bracketed insertions added; otherwise verbatim.) When Plaintiff responded, "That is fucked up that you want me to lose my job," Defendant replied, "Lost, quit, move or whateveru call it. so nobody win." (Verbatim quote.) Defendant sent other messages stating the following: "Mark my word, even after google finish clearing the cache and cvu still letting u go, u gonna react differently"; "Again I'm sorry for snapping at u today and *threatening to put the pictures back up*. No excuses just apology[.]" (Emphasis and bracketed insertion added; otherwise verbatim.)

On February 9, 2012, Defendant sent Plaintiff an e-mail reiterating his demands from the

-10-

day before, *e.g.*, stating "[n]ow show me something that you support me and trying to make this Fashion week not as painful. And this support need to be directed to my industry." (Bracketed insertion added; otherwise verbatim.)

On February 14, 2012, Plaintiff e-mailed Defendant, stating that Defendant's posting the nude photographs on various Web-site had "been one of [Plaintiff's] worst nightmares." Plaintiff informed Defendant that he was finished with modeling and that he would have no further contact with Defendant.

On February 14, 2012, Defendant responded by e-mail that included the following statement: "As we discussed over the phone on February 12th, 2012 at 11.30 pm as well as your email, dated 02/12/2012, you stated that you 'can't and won't do things you don't want to do,' I am responding in likeness." (Verbatim quote.) Defendant also wrote the following:

> The fact that you can't even follow through on anything or do what you said you would do, in essence reversing your action – I am reversing all my actions as well. After that I will not do anything until I receive offers from you which are comparable to what you are asking of me. It is now your responsibility to arrange propositions that will entice me into agreement. I refuse to continue in any further discussions with you concerning your pictures until these conditions are met and your obligation fulfilled.

The complaint alleges that, "in March/April 2012, Defendant created three more websites in Plaintiff's name," and posted on those Web-sites nude photographs of Plaintiff, "some of which had been edited" to depict Plaintiff with a tumescent penis or ejaculating. Plaintiff adds that the Web-sites also promote photographs that are password-protected, that nude photographs of Plaintiff have been posted on other Web-sites, and that nude photographs posted on the Internet have been tagged with the name of Plaintiff's employer.

Plaintiff also alleges his belief that, "under fictitious names," "Defendant composed and sent a series of e-mails to" several youth soccer associations, and that "[t]hese e-mails were sent

maliciously and with the intent to have Plaintiff's employer terminate his employment and to embarrass and humiliate Plaintiff. . . ."[9]

*C.*

Defendant submitted his 85-page answer and counter-complaint (48 pages of which is the counter-complaint, in turn repeating much of the content of the answer)[10] with an additional 146 pages of exhibits. I have thoroughly reviewed Defendant's pleadings and the submissions attached thereto and, aside from simple denials, Defendant's filings do little to materially controvert the allegations of the complaint. However, Defendant's pleadings and submissions include a great quantity of statements, characterizations, and admissions (of which more later) that constitute "redundant, immaterial, impertinent, [and] scandalous matter" (again, of which more later), and because of the redundancies, immateriality, impertinence, and scandalousness of the pleadings and other submissions, I could strike them. *See* Fed. R. Civ. P. 12(f). For the same reasons, I could strike Defendant's pleadings for not complying with Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires "a *short* and *plain* statement of the *claim* showing that the pleader is entitled to relief[.]"[11] (Emphasis added.)

Nonetheless, upon review and consideration of the merits of Defendant's counterclaims,

---

[9] Copies of these e-mails have been submitted as exhibits in support of the complaint.

[10] Defendant's pleading is extremely repetitious, and it is inconsistent in many ways, especially as to its temporal assertions. The line spacing of Defendant's pleadings is not single-spaced, but it is less than double-spaced.

[11] Even a *pro se* litigant, whose pleadings must be construed liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), must "comply with . . . the pleading requirements of Rule 8," *Davis v. Bacigalupi*, 711 F. Supp. 2d 609, 615 (E.D. Va. 2010). *See also McNeil v. United States*, 508 U.S. 106, 113 (1993) (observing that the Supreme Court of the United States "ha[s] never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."). Defendant, however, is not a *pro se* litigant. He was and is represented by counsel (at present, Defendant is represented by his third set of counsel, who have now moved twice to withdraw from representing him). Accordingly, Defendant's pleadings are not entitled to such a liberal construction.

and given the admissions (and other statements and characterizations) presented within Defendant's voluminous pleadings and submissions in support thereof, I must discuss certain portions of the matter found therein. Indeed, Defendant's disregard for the language of Rule 8(a)(2), requiring "a *short* and *plain* statement of the *claim* showing that the pleader is entitled to relief," turns out to be one of those instances where the party has pleaded himself out of court "by pleading facts that show he has no legal claim." *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (citations omitted); *see also Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted) (it "'is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible'").

### 1. Defendant's Answer

Defendant "admits that he told Plaintiff that he would not release certain fully nude body posing practice photos he took of Plaintiff . . . ."

Defendant admits that he posted photographs to the "members only section of Defendant's website at rudykphotography.com where Plaintiff and *hundreds of others had full access*, as well as *publicly displayed on the websites of third parties* . . . ." (Emphasis added.)

Defendant admits that, "after [Plaintiff] had taken a job at CVUS and a board member of a competing soccer club . . . brought Defendant's photographs to the attention of Plaintiff's employer," Plaintiff "claimed that his *publicly available* partially nude and fully nude fine art photographs, including ones displaying [Plaintiff's] genitals, were detrimental to [Plaintiff's] coaching career . . . ." (Emphasis added.)

Defendant states that "a number" of "the many thousands of fine art nude and 'physique' photos of Plaintiff" were "*publicly available* on Defendant's two websites, and on the websites of third parties[] . . . ." (Emphasis added.)

Defendant states that "some of" "the thousands of nude photographs Defendant had taken of Plaintiff . . . were *publicly displayed* on Defendant's two websites, as well as on the websites of third parties[] . . . ."  (Emphasis added.)

Defendant "admits that . . . there continued to be a number of fully nude photographs displayed on Defendant's two websites, as well as *picked up and displayed on the websites of third parties*[] . . . ."  (Emphasis added.)

In June 2011, Defendant "told Plaintiff he would no longer work with him as a model," and asked Plaintiff "to return the modeling portfolio (large book), business cards and composite cards (comp cards) which Defendant had spent approximately $7000.00 to have printed for Plaintiff."  Defendant "further admits that at this time he told Plaintiff not to use any of Defendant's copyrighted photographs, specifically those photographs Defendant had taken of Plaintiff, or Defendant would enforce his legal rights in them."  Defendant

> admits that during May or June 2011 that Plaintiff returned the modeling portfolio Defendant paid to have prepared, the clothing Defendant had given to Plaintiff, the Android smartphone Defendant had given to Plaintiff (this was the first of two phones Defendant gave to Plaintiff – defendant gave the second Android smartphone to Plaintiff in July 2011 and it was never returned by Plaintiff), and a check for the money Defendant gave Plaintiff to pay for Plaintiff's [*sic*] funeral expenses, but Defendant never cashed that check and instead returned it to Plaintiff's mother.[12]

Defendant states that, "moved by" Plaintiff's mother's request that Defendant help Plaintiff "with his modeling career and to help Plaintiff increase his income," he "apologized to her for losing his temper with Plaintiff and returned Plaintiff's portfolio to her."

---

[12] Defendant states that he has given Plaintiff great sums of money and many gifts of great value, perhaps well in excess of the annual gift tax exclusions ($13,000 in 2011).  However, it appears that these "gifts" are not really "gifts."  A "gift" results from "detached and disinterested generosity," is made "out of affection, respect, admiration, charity or like impulses," and is not made as an "incentive of anticipated benefit."  *C.I.R. v. Duberstein*, 363 U.S. 278, 285 (1960) (citations and quotations omitted).

Defendant admits that

> Plaintiff told him that a board member of another soccer club in Forest, Virginia[] . . . had conducted an internet search using Plaintiff's name and had discovered Plaintiff's website jamestharpe.net, where there were fine art partially nude photographs of Plaintiff taken by Defendant which were uploaded to and posted on Plaintiff's website by Plaintiff *and Defendant together from Defendant's home* in early 2011. Defendant further admits that Plaintiff told him that [the board member of the other soccer club] had told Plaintiff's employer CVSU that he did not approve of certain photos on Plaintiff's website.

(Emphasis added.) "Defendant admits that at the request of Plaintiff he took one non-nude photograph of Plaintiff down from Plaintiff's website because he had access to Plaintiff's website . . . ." Defendant "further admits that after he took the one photograph down for Plaintiff," Plaintiff told him of other soccer-club-related complaints "about a second non-nude photograph of Plaintiff," and that Defendant also "took down" that photograph "upon Plaintiff's request." Defendant

> admits that following numerous requests from Plaintiff to assist Plaintiff with the situation with [the board member of the other soccer club] and [Plaintiff's] employer CVUS, and following a conference call with Plaintiff and Brent Kellum, Technical Director at CVUS, he sent Mr. Kellum and Plaintiff an email on August 19, 2011 stating, among other things, that at their request he had blocked numerous computer IP addresses (approximately 153,000) from the Lynchburg, Virginia area from viewing Plaintiff's website, that he had taken down two photographs of Plaintiff from Plaintiff's own website which Plaintiff could have taken down himself, that Plaintiff and Mr. Kellum were making these numerous requests of Defendant during Defendant's busiest time of the year for his business, and that he would not be taking down any more photographs from Plaintiff's own website for Plaintiff.

Defendant admits that, regarding a poster and postcard project in which Defendant intended to use Plaintiff as a model,

> he and Plaintiff exchanged text messages on October 5, 2011 about the postcard and poster company opportunity, the fact that said company does not typically include genitalia in their fine art nude posters and postcards, Plaintiff's *request that they not show his genitals*, and Defendant responded by telling Plaintiff that the poster and postcard company typically does not include genitalia in their fine

art nude posters and postcards. . . . *Defendant further admits* that he and Plaintiff exchanged a series of text messages on October 13, 2011 concerning clothing given to Plaintiff by Defendant for a photoshoot, *that Plaintiff stated that he did not want to do any more fully nude photo shoots* because he felt he had enough to show third parties for promotional purposes, [and] that Defendant had sent Plaintiff an email of examples of fine art nude photographs . . . .

(Emphasis added.) Defendant states that, on "the very next day" and over the course of several days thereafter, he shot 1,838 photographs of Plaintiff, 1,434 of which were nudes, and some of which included exposure of Plaintiff's genitals.

Defendant denies that, after October 2011, he "posted a fully nude photograph of Plaintiff on Plaintiff's website at jamestharpe.net," but he admits that either he or Plaintiff (the language in the answer is imprecise) blocked the other's

administrative access (and ability to post or remove content) to Plaintiff's website at jamestharpe.net in November or December 2011. Defendant further admits that he posted twenty-two (22) *publicly accessible* and *publicly displayed* fully nude photographs of Plaintiff, showing Plaintiff's genitals, on his website at rudykphotography.com/blog between June 20, 2010 and February 17, 2012, and that Plaintiff was fully aware of the *public display* of his genitals *on Defendant's website* that entire time. Similarly, Defendant further admits that between July 31, 2010 and August 13, 2011, he *posted and displayed* seven fully nude photographs of Plaintiff showing Plaintiff's genitals *on his website* at rudykphotography.com in the "Client Login" registered member section (which leads to rudykphotography.info), which photo section was accessibly [*sic*] by *hundreds* of members of Defendant's website *once they were approved by Defendant*, *including Plaintiff since March 18, 2010*, and that Plaintiff was fully aware of the display of his genitals in those seven photos at the time they were posted and thereafter. Defendant further admits that some of the aforementioned photographs were *picked up and publicly displayed at the websites of third parties* and that Plaintiff was fully aware of those third party displays. Defendant admits that he posted the aforementioned fully nude photographs of Plaintiff for their promotional value to his business pursuant to his copyrights and the rights and permissions granted to him expressly by Plaintiff in the two separate standard model releases signed by Plaintiff. Defendant further admits that on November 5, 2010, in response to Plaintiff asking him whether Defendant's fully nude photographs of Plaintiff, including those displaying Plaintiff's genitals, were showing up in *Google search results* following searches for Plaintiff's name, *Defendant told Plaintiff* via text message that Plaintiff needed *to search* with the "safe search" option off in order to view any nude or semi-nude photographs

which showed up in the *Google search results*.

(Emphasis added.) Defendant states that, after "numerous downloads of photos from his websites," he "rescinded the limited nonexclusive *permission he had earlier granted* to Plaintiff to display his images for promotional and related uses . . . ." (Emphasis added.) Defendant states that, although he had "rescinded" the permission "he had earlier granted," Plaintiff thereafter "used and displayed six of Defendant's copyrighted photographs as his primary modeling portfolio at models.com until Defendant's [then-attorney, apparently John D. Mason] demanded again that Plaintiff cease all use of Defendant's copyrighted works . . . ."

Defendant repeatedly "admits that he posted twenty-two *publicly accessible* and publicly displayed fully nude photographs of Plaintiff, showing Plaintiff's genitals, on his website at rudykphotography.com/blog between June 20, 2010 and February 17, 2012,"[13] and that he posted additional nude photographs available to "hundreds" of other approved users of his website, including Plaintiff. (Emphasis added.) Defendant admits that he added "keywords" and tags to photographs of Plaintiff, including Plaintiff's name, "Central Virginia, United States," "coach," "physique," "male model," and "soccer." Defendant admits that, "in late summer 2011," upon Plaintiff's request, Defendant photographed "a head shot of Plaintiff for Plaintiff to use" on his employer's Web-site.

"Defendant admits that he took a fully nude photograph of Plaintiff with a semi-erect penis on August 7, 2010, retouched it on August 7, 2010 and in September 2010, and uploaded and posted it" to a "gallery on his website," "which Plaintiff and hundreds of other people could access." "Defendant further admits that in order to enhance that photograph's commercial

_____

[13] The link is still publicly accessible, and as of today still displays nude photographs of Plaintiff.

quality and value, he retouched various parts of Plaintiff's body in it," including Plaintiff's penis, "at Plaintiff's request to 'make his penis look good to impress girls[.]'" The parties communicated electronically about retouching, and Defendant sent a message stating, "I was enlarging your chest and biceps using lens correction and voilaa ur peepeee get enlarged as well." (Verbatim quote.) Defendant admits that the retouched photograph remains "posted and *publicly displayed . . .* on his *fully accessible public website*" and that the photographs are tagged with keywords embedded in the digital files. (Emphasis added.) Defendant also admits that "internet search engines began connecting Defendant's photographs of Plaintiff more and more strongly with those keywords . . . such that search results for the name of Plaintiff's employer, Central Virginia United Soccer, began to include Defendant's long publicly displayed fully nude photographs of Plaintiff. . . ."

Regarding the allegation in the complaint of "Defendant's demand for consideration for removing these photographs," Defendant suggests that extortionate threats are in the ordinary course of dealing for "fashion" photographers:

> Defendant further admits that models who take nude and fully nude photographs *in their youth* often come to regret it in later years for a variety of reasons, especially when the photographs are publicly accessible on the internet, that *it is a common situation in the fashion industry*, and that *it is one which he has dealt with in the past*, and one where often a *fair and reasonable sum is paid to the rights holder photographer* for the rights which the now remorseful model wants to acquire.

(Emphasis added.)

Defendant admits that, on February 7 or 8, 2012, "he apologized for threatening to put back up the approximately eleven publicly accessible fully nude photographs of Plaintiff which he had recently taken down from his website rudykphotography.com/blog following Plaintiff's repeated requests." Defendant further admits that, "in response to Plaintiff's email of February

14, 2012," wherein Plaintiff essentially stated that he wanted no more contact with Defendant,

> Defendant sent Plaintiff an email in which he told [Plaintiff] "I am reversing all of my actions as well.  After that I will not do anything until I receive offers from you which are comparable to what you're asking of me."  *Defendant further admits that models who take nude and fully nude photographs in their youth often come to regret it in later years for a variety of reasons, especially when the photographs are publicly accessible on the internet, that it is a common situation in the fashion industry, and that it is one which he has dealt with in the past, and one where often a fair and reasonable sum is paid to the rights holder photographer for the rights which the now remorseful model wants to acquire.*

(Emphasis added.)

Leaving behind Defendant's repeated admissions regarding the supposed customary practices of fashion photographers dealing with models, "Defendant admits that," purportedly "pursuant to the rights granted by Plaintiff in the two separate model releases to Defendant to use Plaintiff's name in connection with Defendant's photographs of Plaintiff,"

> he registered four domain names which included permutations of Plaintiff's name: jamestharpe.net, jimmytharpe.net, jimmytharpe.com, and jtharpe.com. Defendant admits that on May 16, 2010 he registered and told Plaintiff that he had registered jamestharpe.net, Plaintiff knew Defendant had done this and that *Defendant gave Plaintiff access to and ownership of the website they built together* during December 2010 and January 2011. . . .

(Emphasis added.)  Defendant admits that "he set up orders with a domain name registrar for jimmytharpe.net, jimmytharpe.com, and jtharpe.com, . . . even though the relationship between Plaintiff and Defendant had soured," and that "in late March 2012 he had two websites go live at jimmytharpe.net and jimmytharpe.com and posted photographs on them," and a "website created at jtharpe.net went live in April 2012."

Defendant admits that

> in a number of fully nude photographs Defendant took Plaintiff is either partially or fully erect, and *one of those was enhanced by Defendant to enlarge Plaintiff's penis* and other enhance Plaintiff's other body features on August 7, 2010 and in September 2010.  Defendant admits that as a joke in late Summer/early Fall 2010

he photoshopped what appeared to be *ejaculate into a photograph of Plaintiff with an erection* taken on August 7, 2010, and that he gave a copy of that photoshoppped photograph to Plaintiff and viewed it with him in person in the Fall of 2010.  Defendant admits that in late April 2012 he uploaded a small cropped portion of the stomach of that photoshopped photograph, with a small amount of photoshopped fake ejaculate, at the website jimmytharpe.net, and that those pages of that website never went live to the public and were not accessible from the internet.  Defendant also admits that in late April 2012 he uploaded that entire photoshopped photograph, containing the photoshopped fake ejaculate, at the website jimmytharpe.com, and that those pages of that website never went live to the public and were not accessible from the internet.

(Emphasis added; otherwise verbatim.)

Defendant states that, on July 31, 2010, he photographed Plaintiff with a female model, and that Plaintiff and the female model "posed together partially clothed and fully nude and often intertwined with each other for more than four hours and thousands of photographs." Defendant further admits that "Plaintiff became aroused" during the shoot, and that such arousal is apparent from the photographs.  "Defendant admits that" he and Plaintiff exchanged text messages referring to Plaintiff's "leaky faucet," that "Plaintiff wrote 'Lol, I guess I was a little turned on," and "that following this text exchange Plaintiff and Defendant began referring to Plaintiff's semen as 'Jimmy Juice'."  "Defendant further admits that on November 18, 2011" he uploaded a photograph containing "a barely visible drop of Plaintiff's ejaculate to jtharpe.com, and that in April 2012 he made that website live for public viewing."

## 2.  Defendant's Counter-Complaint

Defendant states that, between March 18, 2011, and October 21, 2011, "Defendant and Plaintiff . . . conducted 42 total photoshoots together," for a total of "139:16 hours or approximately 5.8 entire days of shooting photographs."  Defendant adds that his "hourly rate is $500.00 per hour if Defendant supplies clothing, and $350.00 if models bring their own clothes." Defendant states that most of the photographs were taken in Maryland, some in Washington,

some in Virginia, and some in New York. Defendant states that, of the "approximately 27,941 clothed and nude photographs" he made of Plaintiff, 15,232 were "nude and semi or partially nude," and that "Defendant shot semi or partially nude or nude photographs of Plaintiff" "at 33 of the 42 total photoshoots."

Defendant goes on to allege a great deal of detail about every photo session. Describing "the nineteenth photo shoot Defendant had with Plaintiff on July 31, 2010 in Rockville, Maryland," he restates details he provided in his answer:

> a) Defendant took 2147 nude and semi or partially nude photographs of Plaintiff, including some displaying Plaintiff's genitals; b) on his computer or camera during the photoshoot, Defendant showed Plaintiff many of the nude photographs of Plaintiff taken that day; c) that Plaintiff shot that day with [a female model], a friend of Defendant who Plaintiff contacted because Plaintiff wished to do a photoshoot in which he posed with a female model; Defendant was not prepared to shoot [the female model] because he was not notified she was attending the photoshoot and did not have clothes ready for [her]; e) Plaintiff and [the female model] posed together partially clothed and fully nude and often intertwined with each other; f) Plaintiff and [the female model] posed together for more than four hours and Defendant took numerous photographs of them; g) Plaintiff became aroused during said photoshoot and his penis was fully or partially erect at times during the photoshoot when Defendant was photographing him; h) Defendant emailed to Plaintiff on or about November 5, 2010 and attached a copy of one photograph from that photoshoot containing what appears to be a barely visible drop of ejaculate on Plaintiff's genitals; i) in a text message exchange later that day Plaintiff referred to that photo as "leaky faucet"; j) in that same November 5 2010 text message Plaintiff wrote "Lol, I guess I was a little turned on"; k) following this photoshoot, Plaintiff and Defendant began referring to Plaintiff's semen as "Jimmy Juice" . . . .

Defendant states that he "*invested* significant resources" to help "Plaintiff develop *himself* and promote *his* modeling career," adding that he "paid Plaintiff approximately $17,000.00 in fees and reimbursed costs, including meals, parking, gas, airfare, train tickets, hotel stays, and assorted other costs" and that he "*gave* Plaintiff approximately $24,000.00 in clothing, shoes, modeling supplies/cosmetics (hair products, etc.), printing costs for business

cards, promotional composite cards, a professional modeling portfolio book, studio time fees, promotional fees, stylists, and assorted other costs." (Emphasis added.) Defendant states that he "introduced Plaintiff to many of Defendant's own contacts in the fashion industry and companies and people with whom Defendant did business," and that he "used clothed and nude photographs to promote Plaintiff in the Fashion industry, and clothed and nude photographs taken by Defendant were included in Plaintiff's modeling portfolio book." In addition to having "paid" Plaintiff and making generous "gifts" to him, "Defendant sometimes loaned Plaintiff money, and sometimes gave Plaintiff money, such as the time in early Spring 2011 he gave Plaintiff money to assist Plaintiff with the burial expenses for Plaintiff's father."

Defendant states that he "maintains a limited access gallery on his website . . . where approximately 500 people *Defendant has approved*, *including Plaintiff*, can access fully nude photographs taken by Defendant which he may have more publicly released yet." (Emphasis added; otherwise verbatim.) Defendant specifies that he "*gave Plaintiff access and an approved password* to his 'Client Login' gallery . . . on March 18, 2010 at their first photoshoot." (Emphasis added.) Defendant states that, "[b]etween June 20, 2010 and February 17, 2012, Defendant posted twenty-two (22) *publicly accessible* and *publicly displayed* fully nude photographs of Plaintiff . . . ." (Emphasis added.)

Defendant repeats details about having made photos of Plaintiff "publicly accessible," and of Plaintiff having access to Defendant's "Client Login" section, where access was "limited" to "hundreds of members of Defendant's website." Defendant states that, on July 2, 2011, he sent an e-mail to Plaintiff informing Plaintiff that Plaintiff was "number 1 again on Google," a publicly accessible Web-site. And again, as in his answer, Defendant states that photos of Plaintiff "were picked up and publicly displayed at the websites of third parties." On his

Facebook page, Defendant "periodically posted links to clothed photos of Plaintiff . . . as well as fully and semi or partially nude photographs of Plaintiff he had taken, frequently linking directly to fully nude photographs of Plaintiff . . . ."

Defendant alleges that, "[p]ursuant to the rights granted in the standard modeling release signed by Plaintiff on March 18, 2010, and on May 16, 2010," he "registered and told Plaintiff that he had registered the domain name jamestharpe.net," but that he "then gave Plaintiff access to and ownership of the website which they built at jamestharpe.net together during December 2010 and January 2011 . . . ."

Defendant alleges that, after Plaintiff refused to attend a photo session in June 2011, he "told Plaintiff he would no longer work with him as a model," and "asked that Plaintiff return the professional modeling portfolio (large book), business cards and composite cards (comp cards) which Defendant had spent approximately $7000.00 to have printed for Plaintiff." Defendant states that he also "told Plaintiff not to use any of Defendant's copyrighted photographs, specifically those photographs Defendant had taken of Plaintiff, or Defendant would enforce his legal rights in them."

As described at length in the answer, the counter-complaint states – at length – that much trivial drama between the parties followed, some of it even involving Plaintiff's mother, but the co-dependent relationship between the parties continued, with Defendant again photographing Plaintiff and giving him things, such as train tickets.

Also as described at length in the answer, the counter-complaint provides a lengthy description of the involvement of Plaintiff's employer in the parties' disagreement. Defendant alleges that a man from another soccer club in the area, whose Internet Protocol ("IP") address "Defendant was able to trace . . . to his place of employment," was making "unauthorized and

infringing downloads of Defendant's copyrighted photographs which he was making from Plaintiff's website." Defendant states that he "wrote an email to [the alleged infringer's] employer concerning the infringement of his copyrighted photographs and [the] employer responded by eventually indicating that it would cease and that all infringing copies would be destroyed per Defendant's demand."

As in the answer, Defendant provides lengthy allegations describing his purported attempts to cooperate with Plaintiff's (and Plaintiff's employer's) requests that Defendant take down nude photographs of Plaintiff that were linked to Plaintiff's employer. However, Defendant thereafter again "worked with Plaintiff in late September and early October 2011," with Defendant providing some degree of assurance to Plaintiff that a proposed "fine art" poster and postcard project would "not include genitalia." But, "in the second half of October 2011," the parties' "relationship worsened," when "Defendant offered Plaintiff a modeling opportunity and Plaintiff agreed to do the casting in New York," but "then with less than twenty four hours notice Plaintiff quit the casting."

Defendant alleges that Plaintiff accused Defendant of having "installed spyware on Plaintiff's phone." Defendant acknowledges that he had obtained "Plaintiff's computer IP address at home" when

> Plaintiff had accessed Defendant's website from Plaintiff's home while they spoke on the telephone, and while they spoke Defendant observed Plaintiff's login to Defendant's website and his website had saved Plaintiff's unique home computer IP address; Defendant knew Plaintiff's computer IP address at work . . . from electronic mail headers on electronic mail sent by Plaintiff from his [work] email address; Defendant also knew Plaintiff's laptop computer's unique signature and observed that Plaintiff sometimes *tried to* access various websites related to Defendant and Plaintiff, as well as download photos from Defendant's websites, *from a third computer IP address* . . . .

(Emphasis added; IP addresses elided.) Defendant provides an IP address for this alleged "third

computer," but provides only his bald allegation to link it to Plaintiff.

Significantly, Defendant alleges that, "[d]uring November and early December 2011," "there were a number of downloads of Defendant's photographs from Plaintiff's home IP address and from Plaintiff's work IP address." However, although Defendant cites IP addresses left and right, and has submitted a sheaf of submissions documenting data accessed and access denied, in this instance "Defendant's server company had a server crash and lost the server logs for November 2011 and early December 2011." Thus Defendant again provides only his own bald allegation that, "[d]uring November and early December 2011," "there were a number of downloads of Defendant's photographs from Plaintiff's home IP address and from Plaintiff's work IP address."[14]

Defendant states that, on December 8, 2012, he wrote a letter informing Plaintiff that his

limited license to use (including but not limited to: copying, publicly displaying and publicly distributing) Rudy K photographs and digital files is hereby terminated. That means that all modeling and or related photographs taken and/or owned by me must be removed from your portfolio, publications, handout, business cards and communications, as well as from all websites.

It appears that this letter, which Defendant characterizes as a "cease and desist letter," is actually dated December 8, 2011.

Defendant maintains that, after writing this letter, "attacks" on his Web-site continued, and his "website was frequently subject to hacking attacks which were sometimes traceable back to Lynchburg or Roanoke, Virginia, and sometimes traceable back to" IP addresses that Defendant claims belong to Plaintiff. In support of this allegation, Defendant has submitted

---

[14] Similarly bald is his allegation that, "[d]uring November and early December 2011," "Defendant's websites, and mostly his primary website at rudykphotography.com, were subject to numerous hacking attacks where outside users attempted to access the 'admin' section of the website in order to gain access to control of the internal working of the website," but in this instance he does not even link the alleged "hacking" to Plaintiff, and the allegation is clearly immaterial and impertinent. *See* Fed. R. Civ. P. 12(f).

"redacted" e-mails and other documents that he has composed.

Defendant alleges that, after writing the cease and desist letter, "one hundred and seventy four (174) unauthorized and infringing downloads of . . . fifty-four (54) copyrighted photographs from Defendant's" publicly accessible "website at rudykphotography.com/blog . . . were recorded by Defendant and were traceable back to" Plaintiff. Defendant states that these photographs were registered with the Copyright Office on June 1, 2012.

Defendant states that, regarding Plaintiff's display of six of Defendant's photographs, registered with the Copyright Office on June 21, 2012, on Plaintiff's "models.com" profile, Defendant's counsel "demanded that . . . Plaintiff remove said copyrighted works from Plaintiff's modeling portfolio on November 1, 2012, at which time they were removed . . . ."

Defendant acknowledges that he does not know whether his photographs of Plaintiff, "which he alleges . . . that Plaintiff has copied and/or displayed without authorization," have been distributed by Plaintiff, but he alleges that "Plaintiff has told Defendant in the past that *others* were copying and distributing downloaded copies of copyrighted photographs." (Emphasis added.)

Among the many repetitions of lengthy material stated in the answer, the counter-complaint states that,

> [c]oncerning Plaintiff's allegation in Exhibit 36 that one of the publicly posted photographs had a "photoshopped erect penis": a) Defendant took a fully nude photograph of Plaintiff with a semi-erect penis on August 7, 2010; b) Defendant retouched that on August 7, 2010 and in September 2010; c) on August 7, 2010 Defendant uploaded and posted that photo in his "Client Login" gallery on his website at rudykphotography.com, *which Plaintiff and hundreds of other people could access*; d) in order to enhance that photograph's commercial quality and value, Defendant retouched various parts of Plaintiff's body in it, including Plaintiff's abdomen, scrotum (at Plaintiff's specific request because when he viewed the original raw photograph, Plaintiff complained about his droopy scrotum, or as Plaintiff put it, his "tea bag problem"), face, biceps, and penis

(again at Plaintiff's request to "make his penis look good to impress girls"); e) Defendant sent an e-mail to Plaintiff on September 3 2010 containing two attachments of Plaintiff's scrotum from the photograph, one without retouching and one with retouching to address what Plaintiff described as his "tea bag problem", and Defendant asked Plaintiff if he could use the retouched version instead of the original . . . f) Defendant also sent a copy of the aforementioned retouched photograph to Plaintiff on November 7, 2010, and in a contemporaneous text message Defendant stated "I was enlarging your chest and biceps using lens correction and voilaa ur peepee get enlarged as well", to which Plaintiff replied via text message "Lol, I will get tons of models with a horsecock like that" . . . ; Defendant further admits that on December 11, 2010, he uploaded, posted and publicly displayed the aforementioned retouched photograph of Plaintiff on his fully accessible public website at rudykphotography.com/blog, where the photograph has remained on public display from December 11, 2010 until the present, which public display Plaintiff has long been fully aware of . . . .

(Emphasis added; citations elided; otherwise verbatim.)

Defendant states that the parties met and had discussions in January 2012, subsequent to which "Defendant set up orders with a domain name registrar for jimmytharpe.net, jimmytharpe.com, and jtharpe.com, which orders automatically went through within a few weeks."

Defendant again states that he "was well aware of the common situation where models who take nude and fully nude photographs in their youth often come to regret it in later years for a variety of reasons, especially when the photographs are publicly accessible on the internet," and that "this was a situation Defendant had dealt with in the past with other models and one where often a fair and reasonable sum is usually paid to the rights holder photographer for the rights which the now remorseful model wants to acquire."

Defendant states that, "[a]round this time" – presumably mid- to late-January 2012 – "in response to numerous requests from Plaintiff, Defendant took down a number of fully nude photos of Plaintiff from his website at rudykphotography.com/blog, many of which had been up since before Plaintiff worked at CVUS."

Defendant alleges that,

> [d]uring March and April 2012: a) the attacks and hacking directed out of Virginia at Defendant's website increased until his website was sometimes going down for periods of time; b) Defendant first attempted to redirect internet traffic from Virginia computer IP addresses to Google.com in an effort to stop the damaging attacks on his website but *Google complained to him and he stopped*; c) next, Defendant made live one of the websites he had recently registered when he and Plaintiff had contemplated a fashion line and apparel business in January 2012, and Defendant redirected Virginia computer IP address traffic to that website jimmytharpe.com in an effort to stop the hacking attacks on his website; d) when that website began to go down due to the attacks, Defendant made live another one of the websites he had recently registered when he and Plaintiff had contemplated a fashion line and apparel business in January 2012, and Defendant redirected Virginia computer IP address traffic to that website jimmytharpe.net from jimmytharpe.com; e) when that website began to go down due to the attacks, Defendant made live the final one of the websites he had recently registered when he and Plaintiff had contemplated a fashion line and apparel business in January 2012, and Defendant redirected Virginia computer IP address traffic to that website jtharpe.com from jimmytharpe.net; f) Defendant posted fully nude photographs of Plaintiff, all of which [he] had already posted publicly on the internet, pursuant to his copyrights in his photographs and the rights and permissions granted to Defendant by Plaintiff in the two standard model releases signed by Plaintiff.

(Emphasis added.)

### D.

#### 1. Standard of Review

Rule 12(h)(3) of the Federal Rules of Civil Procedure provides that, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). A district court must "raise [such] lack of subject-matter jurisdiction on its own motion," without regard to the positions of the parties. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982); *see also Plyler v. Moore*, 129 F.3d 728, 731 n. 6 (4th Cir. 1997) ("questions concerning subject-matter jurisdiction may be raised at any time by either party or sua sponte by [the] court") (citing *North Carolina v.*

*Ivory*, 906 F.2d 999, 1000 n. 1 (4th Cir. 1990)). "[C]ourts[] . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," and "when a federal court concludes that it lacks subject matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citations omitted). The complainant bears the burden of establishing jurisdiction, *see Richmond, Fredericksburg & Potomac R.R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991), and a court may consider evidence outside the pleadings without converting the matter to a summary judgment proceeding, *see Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

Of significance here, "federal courts are without power to entertain claims otherwise within their jurisdiction" if such claims are, among other things, "devoid of merit." *Hagans v. Levine*, 415 U.S. 528, 536-37 (1974) (citations and quotations omitted). As I observed earlier, Defendant's disregard for the language of Rule 8(a)(2), requiring "a *short* and *plain* statement of the *claim* showing that the pleader is entitled to relief," is one of those instances where the party has pleaded himself out of court "by pleading facts that show he has no legal claim."[15]

## 2. As Pleaded, the Counterclaims Are Devoid of Merit

### a. Copyright

Throughout his pleadings, Defendant repeats the following admissions:

- Defendant gave Plaintiff access to the restricted access "Client Login Gallery" section of Defendant's Web-site, which was accessible to "hundreds" of people.

- Defendant "frequently" e-mailed "copies of photographs" he had made of

---

[15] *See, e.g., Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007); *Orthmann v. Apple River Campground*, 757 F.2d 909, 915 (7th Cir. 1985); and *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)) (recognizing that a plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim").

Plaintiff to Plaintiff.  Defendant "frequently" sent "copies of photographs" he had made of Plaintiff to Plaintiff using other electronic means of delivery, such as text messages.  And, "[f]requently, following a photoshoot, Defendant would send Plaintiff copies of photos Defendant took of Plaintiff[.]"

•     Defendant sent photographs of Plaintiff to Defendant's contacts at various modeling agencies in an effort to obtain modeling work for Plaintiff.

•     Defendant publicly displayed photographs of Plaintiff, on his unrestricted access Web-site and on his "Client Login Gallery" (to which he gave Plaintiff access).

•     Defendant paid for and gave to Plaintiff modeling necessities, such as a portfolio and comp cards, *which were composed of photographs of Plaintiff made by Defendant*.

•     After a break-up in the relationship between the parties, Defendant intended to rescind the permission – or license – he had granted to Plaintiff to use the photographs.  Defendant underwent an apparent change of heart when the parties subsequently reconciled, however tentatively, and Defendant again extended a license to use the photographs, *e.g.*, Defendant returned the modeling portfolio to Plaintiff.  There is no allegation or suggestion in the record that any license was expressed in writing.

•     Defendant and Plaintiff, working together, posted photographs Defendant made of Plaintiff on a Web-site that Defendant created for Plaintiff, Defendant having obtained the domain name for Plaintiff.  Defendant "gave access to and ownership of" this Web-site to Plaintiff.

•     Defendant's photographs of Plaintiff "were picked up and publicly displayed at the websites of third parties."

•     Defendant's photographs of Plaintiff could be obtained using the Google search engine.

•     Defendant made a "head shot" photograph for Plaintiff's use on Plaintiff's employer's Web-site.

•     Defendant and Plaintiff worked together to use Defendant's photographs of Plaintiff to promote Plaintiff "as a fitness model" and for a proposed "clothing line and apparel company."

•     Defendant used photographs he had made of Plaintiff "to promote *Plaintiff*

in the fashion industry."  (Emphasis added.)

•       Defendant has long been actively engaged in the practice of making his photographs of Plaintiff readily available and publicly accessible on the Internet, including through Internet portals Defendant and Plaintiff used jointly to promote Plaintiff as a model.

Assuming the validity of Defendant's copyrights, copyright registrations, etc., Defendant's claim that "Plaintiff has infringed" Defendant's copyrights "by his unauthorized reproduction of" six of Defendant's photographs on Plaintiff's models.com profile is devoid of merit, given that Defendant's own pleadings show that any such exhibition of those photographs falls well-within the implied license Defendant granted to Plaintiff to use the photographs.

The Copyright Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."   17 U.S.C. § 204(a).   It is undisputed that Defendant never executed a document granting an exclusive license to Plaintiff.

In contrast to an exclusive license, a nonexclusive license (or, as Defendant described it in correspondence to Plaintiff and others, a "limited license") to use copyrighted property "'may be granted orally, or may even be implied from conduct.'"  *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, (11th Cir. 1999) (quoting *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.1990)).[16]

An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute

---

[16] Section 101 of the Copyright Act excludes the assignment of nonexclusive licenses from the definition of "transfer of copyright ownership."

the work. *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997). Implied licenses may be limited, and a defendant who exceeds the scope of an implied license may commit copyright infringement. *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003). Courts focus on objective evidence revealing the intent of the parties to determine if an implied license exists, and this inquiry also reveals the scope of that license. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009); *Gracen v. Bradford Exchange*, 698 F.2d 300, 303 (7th Cir. 1983) (the scope of an implied license may be proven through parol evidence). In *Asset Marketing Systems, Inc. v. Gagnon*, the United States Court of Appeals for the Ninth Circuit held that a copyright owner must express the intent to restrict the scope of a license when the owner delivers the copyright work. 542 F.3d 748, 756 (9th Cir. 2008).[17] "Thus, an implied license will be limited to a specific use *only* if that limitation is expressly conveyed when the work is delivered." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010).

The crucial touchstone for finding an implied license is intent. *See John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). "Without intent [to permit the use], there can be no implied license." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). In the instant matter, for this one purpose, both parties' intentions are clear: Plaintiff intended to use the photographs to promote himself as a model, Defendant intended to use the photographs to promote Plaintiff as a model (and to promote Defendant as a photographer), and Defendant actively assisted Plaintiff in using the photographs to promote Plaintiff as a model, all

---

[17] In *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008), the parties were in direct communication with one another, but the copyright holder did not attempt to limit the scope of the nonexclusive license until after he had delivered the copyrighted work to the purported infringer. Here, it would appear that Defendant did not attempt to limit the scope of the permission until long after he delivered the copyrighted works, when he decided – apparently out of resentment, and not because his publicly available photographs were being diluted of value – to rescind the permission.

the while distributing photographs of Plaintiff to Plaintiff and others and making photographs of Plaintiff publicly accessible, free of charge. In sum, Defendant created photographic works at Plaintiff's request, delivered the works to Plaintiff, and intended that Plaintiff copy and distribute the works. *See Jacob Maxwell, Inc.*, 110 F.3d at 752.

Defendant's eventual withdrawal of the permission evidences his consent for Plaintiff to use the photographs to promote Plaintiff as a model.[18] Implicit in that permission was a promise not to sue for copyright infringement – a promise that at least one court has found to be the essence of a nonexclusive license. *See In re CFLC, Inc.*, 89 F.3d 673, 677 (9th Cir. 1996) ("[A] nonexclusive patent license is, in essence, 'a mere waiver of the right to sue' the licensee for infringement.") (quoting *De Forest Radio Telephone & Telegraph Co. v. United States*, 273 U.S. 236, 242 (1927)). It follows that, until permission was withdrawn on November 1, 2012, Plaintiff's display of six of Defendant's photographs, registered with the Copyright Office on June 21, 2012, on Plaintiff's "models.com" profile was permitted under Defendant's grant to Plaintiff of a nonexclusive license to use the photographs to promote himself as a model. And, according to Defendant, "said copyrighted works" were removed "from Plaintiff's modeling portfolio on November 1, 2012[.]"

For these reasons, I will dismiss Defendant's copyright counter-claim without prejudice

---

[18] Defendant acknowledges that, upon notice from Defendant's counsel, Plaintiff immediately removed the photographs. In turn, Plaintiff's answer to the counter-complaint, pleading an implied license (among other affirmative defenses), states that Plaintiff had abandoned the models.com profile and had forgotten that the photographs were posted. I stress that, before the withdrawal of the license in late 2012, Defendant gave photographs to Plaintiff to use, then took them away, then gave them to Plaintiff again, and continued to work with Plaintiff to promote Plaintiff as a model, in the course of which Defendant made photographs of Plaintiff publicly available.

pursuant to Rule 12(h)(3).[19]

### b. *Tortious Interference with Contract Expectancy and Prospective Business Relationship*

Regarding the second count of his counter-complaint, Defendant states that he "had an ongoing business relationship, business expectancy, and ongoing agreement with MC2," a modeling agency; that he "is self-employed" and his "ongoing livelihood and stability, and future business opportunity, is dependent upon his continued ongoing business relationships and agreements with his clients and others in the fashion industry, as well as his reputation in the fashion industry"; and that, knowing "of Defendant's ongoing business relationship and ongoing agreement with MC2 as set forth herein, Plaintiff has used improper methods to tortiously interfere [with] said relationship and agreement and the business expectancy which arises from it." Defendant adds that "Plaintiff's acts as described in this Complaint were intentional, malicious, and unlawful and Defendant has suffered monetary damages and loss of reputation."

Defendant's answer provides the following admissions relevant to Plaintiff's

---

[19] As for Defendant's allegation that "Plaintiff has infringed, and or continues to infringe Defendant's copyrights" based on the bald assertion that Plaintiff "has reproduced and copied the Defendant's Downloaded Works without obtaining the copyright owner's permission," Defendant's bald assertion remains just exactly that: a bald assertion. Defendant offers no meaningful allegation (other than his own statements) that Plaintiff has downloaded any of Defendant's photographs, much less that he has used any alleged downloads in excess of the implied license he granted to Plaintiff to use the photographs when he *gave* the photographs to Plaintiff. To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, *and* (2) *copying* of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (emphasis added). "Only where the copyright holder proves *copying* is infringement established." *Ganz Bros. Toys v. Midwest Imps. of Cannon Falls, Inc.*, 834 F. Supp. 896, 899 (E.D. Va. 1993) (emphasis added). Here, Defendant claims only his belief that Plaintiff downloaded his photographs, but he makes no allegation that Plaintiff used the downloads in any way (other than the use granted by the implied license), *i.e.*, Defendant makes no allegation "that the alleged infringer had access to the work *and* that *the supposed copy* is substantially similar to the author's original work." *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 353–54 (4th Cir. 2001) (emphasis added).

Out of an abundance of caution, Defendant's copyright counter-claim is dismissed without prejudice. Defendant is warned, however, that it appears unclear at this juncture that the instant copyright claim was not "presented for [an] improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of [this] litigation," Fed. R. Civ. P. 11(b)(1), and any motion for leave to file an amended counter-complaint will be scrutinized closely.

involvement with MC2:

> Defendant admits that he sent photographs of Plaintiff to his contacts at Miami modeling agency MC2, who then signed Plaintiff to a probationary modeling contract. Defendant further admits that he told Plaintiff that new models usually could not count on modeling as a source of income in their first six months with a modeling agency.

* * *

> Defendant admits that MC2 told him in March 2011 that they were dropping Plaintiff as a probationary model because Plaintiff did not communicate with them, did not make himself available for model castings, and because Plaintiff did not book any modeling jobs. Defendant further admits that MC2 removed Plaintiff's modeling photographs from its modeling website in March 2011.

Defendant's counter-complaint provides the following allegations relevant to Plaintiff's

involvement with MC2:

> On May 13, 2010 Defendant sent Plaintiff to New York to meet with two modeling agencies with which Defendant has business relationships, and Defendant sent photographs of Plaintiff to his contacts at Miami modeling agency MC2, who then signed Plaintiff to a probationary modeling contract; Defendant paid for round trip train tickets for Plaintiff.

* * *

> Miami modeling agency MC2 told Defendant in March 2011 that they were dropping Plaintiff as a probationary model because Plaintiff did not communicate with them, did not make himself available for model casting, and because Plaintiff did not book any modeling jobs, and Defendant saw that MC2 removed Plaintiff's modeling photographs from its modeling website in March 2011.

Defendant alleges that, "[a]fter MC2 dropped Plaintiff as a probationary model in March

2011, in June 2011, Plaintiff agreed in advance to a photoshoot but then refused to attend on the

day of the photoshoot[.]"[20]

---

[20] The relevance of many of the allegations in the counter-complaint is attenuated, at best. For example, Defendant's counter-complaint states that, on August 27, 2012, "Defendant received an email from Kai Jankovic, a photoeditor for Defendant and owner of [a] fashion website/blog." Defendant describes the email as "referencing Plaintiff speaking ill of Defendant to Defendant's fashion industry contacts, *Plaintiff threatening*
(continued...)

Near the end of the counter-complaint, Defendant makes the following allegations regarding Plaintiff's involvement with MC2:

> 114. Defendant had a longstanding business relationship and agreement with MC2, the modeling agency he had introduced Plaintiff to and which had dropped Plaintiff from probationary status as a model in March 2011; that business relationship consisted of an ongoing agreement that MC2 would refer and send their models to Defendant for photoshoots for portfolio development and other purposes, and the model and/or MC2 would pay Defendant's hourly rates; that business relationship and ongoing agreement also included special consideration given to models Defendant recommended and referred to MC2.
>
> 115. Plaintiff knew of Defendant's longstanding business relationship and ongoing agreement with MC2.
>
> 116. In June 2012, MC2 told Defendant that they had been contacted by

---

[20](...continued)

*Defendant's industry contacts with lawsuits*, and the 'cloud' Plaintiff has put over Defendant's name and how it is hurting Defendant's business . . . ." (Emphasis added.) Defendant has provided a copy of the e-mail, which states as follows, in pertinent part:

> There is something I need to address with you . . . as you already guess (since it's all everyone's talking about) it concerns this disconnect between yourself and James, and I'm going to take this way back to when this became uncomfortable.
>
> [A]s an editor i [*sic*] didn't feel comfortable with him requesting for the post spotlighting him to be taken down weeks after it was sent by you. Frankly when talents do stuff like that and behind the backs of their directors/photographer it's never a good indication and this reflects poorly on *your* character.
>
> You've built quite a name for yourself within the industry and publication circle . . . but when other editors, from both webzines and blogs all having the same conversation about a talent ill speaking you [*sic*] or threatening to to [*sic*] use lawful actions if his request wasn't met, totally puts a 'cloud' over your name.
>
> Frankly I wish it would end not just so that things would return to the way it was before, but more so because it's fashion week and this is hurting your business, which by extension affects me. So please quickly deal with this.

(Emphasis added.) Contrary to Defendant's e-mail, the e-mail does not state that Plaintiff was "threatening Defendant's industry contacts with lawsuits"; rather, it states that Plaintiff was "threatening to . . . use lawful actions if his request" regarding the removal of nude pictures "wasn't met." The counter-complaint goes on to state that, eight months earlier, "[i]n December 2011, Plaintiff requested that Kai Jankovic take down all fully nude and semi or partially nude photos of Plaintiff by Defendant," and the counter-complaint acknowledges that, in fact, Mr. Jankovic complied with the request.

Plaintiff, who told MC2 about the instant action, implied they might be involved in it by Plaintiff in some manner, and made derogatory remarks about Defendant; MC2 told Defendant that as a result, they would no longer work with Defendant and his expected business dealings with them based upon their ongoing agreement were terminated, and Defendant has not had one model referred and sent to him from MC2 since that time where before, over the years, they had sent approximately sixteen (16) models to him to shoot.

117.    Defendant has been damaged by Plaintiff's interference with his business relationship, business expectancy, and ongoing agreement with MC2.

As discussed further below, the ultimate, fatal deficiency with Defendant's claim of tortious interference is that Defendant fails to allege any "intentional misconduct" on Plaintiff's part. *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 896 (Va. 1997) (citation omitted).

Another deficiency is that Defendant does not specify where the alleged acts are supposed to have occurred, or where the supposed contract was executed, or the terms of the supposed contract, etc.[21]

Nonetheless, in Virginia, where Plaintiff lives and works, and from where he presumably contacted MC2, in order for Defendant to state a counter-claim for tortious interference with a contract, Defendant must show that (1) he had a *valid contractual relationship* with MC2; (2) Plaintiff knew of the relationship; (3) Plaintiff *intentionally interfered*, inducing or causing a breach or termination of the relationship; and (4) Defendant suffered a loss as a result of Plaintiff's disruption of the relationship. *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493

---

[21] "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable," *id.*

S.E.2d 375, 378 (Va. 1997). The elements for tortious interference with a business expectancy are more-or-less the same, except Defendant must demonstrate in addition to the first element "a probability of future economic benefit" and in lieu of the third element "a reasonable certainty that absent [Plaintiff's] *intentional misconduct*, [Defendant] would have . . . realized the expectancy." *Commercial Bus. Sys., Inc.*, 484 S.E.2d at 896 (citation omitted) (emphasis added).

Here, Defendant does not adequately allege tortious interference with a contract. *Maximus, Inc.*, 493 S.E.2d at 378. Defendant alleges that he had "a longstanding business relationship and agreement with MC2," not a contract. Defendant goes on to state that this "business relationship consisted of an ongoing *agreement*," but not a contractual relationship, formed of the elements of a contract. Indeed, Defendant states "that MC2 would refer and send their models to Defendant for photoshoots for portfolio development and other purposes," but the "agreement" Defendant describes was so imprecise that it had no fixed obligations, given, for example, "that the *model and/or MC2* would pay Defendant's hourly rates." (Emphasis added.) Thus, construed in the light most favorable to his counter-claim, Defendant alleges an at-will contract with MC2. However, "[a]s the Supreme Court of Virginia has held, 'the cause of action for interference with contractual rights provides no protection from the mere intentional interference with a contract terminable at will.'" *Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic*, 542 F. Supp. 2d 452, 463 (E.D. Va. 2008) (citing *Duggin v. Adams*, 234 Va. 221, 227, 360 S.E.2d 832 (1987)). Because "it is clear that any such action would be identical with a claim for tortious interference with business expectancy, . . . the claim for tortious interference with contract is duplicative and unnecessary."[22] *Id.*

---

[22] I note that Defendant's own pleadings indicate that no action of Plaintiff was based on any desire to
(continued...)

-38-

The imprecision of this "agreement" also undermines Defendant's claim of tortious interference with a business expectancy, given that, in addition to the first element of a claim for tortious interference with a contract, *i.e.*, a showing that Defendant had a valid contractual relationship with MC2, *see Maximus, Inc.*, 493 S.E.2d at 378, Defendant must also show "a *probability* of future economic benefit," *Commercial Bus. Sys., Inc.*, 484 S.E.2d at 896 (citation omitted) (emphasis added). An alleged history of referrals between made between Defendant and MC2 does not mean that the parties had a contract from which Defendant could extract "a *probability* of future economic benefit." *Id.* (emphasis added).

Most importantly, instead of the third element of a claim for tortious interference with a contract, *i.e.*, a showing that Plaintiff *intentionally interfered*, inducing or causing a breach or termination of the relationship, *see Maximus, Inc.*, 493 S.E.2d at 378, a claim of tortious interference with a business expectancy requires showing "a reasonable certainty that absent [Plaintiff's] *intentional misconduct*, [Defendant] would have . . . realized the expectancy." *Commercial Bus. Sys., Inc.*, 484 S.E.2d at 896 (citation omitted) (emphasis added).

Here, Defendant fails to allege that Plaintiff engaged in any misconduct, much less "tortious" misconduct.

Intentional misconduct under Virginia's tort of intentional interference requires "[i]mproper methods or means," which "generally involve violence, threats, intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship,

---

[22](...continued)
"intentionally interfere" with Defendant's relations with MC2, but rather to stop the posting of nude photos of Plaintiff, particularly those identifying his place of employment. *See Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378 (Va. 1997).

violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition." *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 688 (Va. 2012); *see also Frank Brunckhorst Co., L.L.C.*, 542 F. Supp. 2d at 464 (quoting *Duggin*, 234 Va. at 227, 360 S.E.2d at ___) ("The Virginia Supreme Court has explained that '[m]ethods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. . . . Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct.'").

Assuming the truth of Defendant's allegations, Plaintiff "told MC2 about the instant action," "implied" that MC2 "might be involved in it by Plaintiff in some manner," and "made derogatory remarks about Defendant." Plaintiff is a former "probationary model" with MC2. He was well-within bounds to tell "MC2 about the instant action." Assuming Plaintiff "made derogatory remarks about Defendant," there is no allegation of defamation. And a supposed "implication" that MC2 "might be involved" in this matter does not constitute "unfounded litigation," or even a threat of "unfounded litigation." In fact, MC2 *is* "involved" in the litigation, given that it is named in the parties' pleadings and discussed in my opinions in this case. In any event, "one party's choice to exercise a legal right, even if it will interfere with the plaintiff's contract interests, 'is not actionable and will not support recovery for tortious interference.'" *Frank Brunckhorst Co., L.L.C.*, 542 F. Supp. 2d at 464 (citing *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 251 Va. 28, 36, 466 S.E.2d 382 (1996)).

For these reasons, I will dismiss Defendant's tortious interference counter-claim without

prejudice pursuant to Rule 12(h)(3).[23]


## III.

### *A.*

Defendant has moved for summary judgment.  The motion must be denied.

"[S]ummary judgment is warranted if, from the totality of the evidence, including pleadings, depositions, answers to interrogatories, and affidavits, the court believes no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law."  *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013) (citing Fed. R. Civ. P. 56[24]; *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995)). A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show that a genuine dispute of material fact exists (or does not exist), a party may not rest upon his own mere allegations or denials.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Rather, the

> party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A)     citing to particular parts of materials in the record, including depositions,

---

[23] As with the dismissal of the copyright counter-claim, Defendant is again warned that it is not clear that the tortious interference claim was not "presented for [an] improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of [this] litigation."  Fed. R. Civ. P. 11(b)(1).  Any motion for leave to file an amended counter-complaint will be scrutinized closely.

[24] Rule 56 of the Federal Rules of Civil Procedure was amended significantly in 2010, but the standard for granting summary judgment remains unchanged, and is so well-settled that it ordinarily does not merit much discussion.  The language of subdivision (a) continues to require that there be "no genuine dispute as to any material fact and" that the movant shows that it "is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).

> documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]

Fed. R. Civ. P. 56(c)(1)(A); *see also Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390 (4th Cir. 1994); *Orsi v. Kickwood*, 999 F.2d 86 (4th Cir.1993). The court's role is to determine whether there is a genuine issue based upon the facts, and "not . . . weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249. However, evidence in support of an assertion must be credible, *see Celotex*, 477 U.S. at 330–34, and admissible, *see Anderson*, 477 U.S. at 247–48; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993); Fed. R. Civ. P. 56(c).

In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Those facts for which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. An issue of material fact is genuine when, "the evidence . . . create[s] [a] fair doubt; wholly speculative assertions will not suffice." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. *See Matsushita*, 475 U.S. at 587. In other words, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute over a material fact exists and precludes summary

judgment. *JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

*B.*

1.  The Summary Judgment Record

My review of the admissible evidence in the summary judgment record discloses the following relevant factual matters, in addition to the facts (and factual disputes) already disclosed in my review of the parties' pleadings and other filings with the court.[25]

Before meeting Defendant, Plaintiff's only other modeling experience was from July to December 2009, with Joel Codiamat, a professional photographer located in Charlottesville,

---

[25] The summary judgment filings include the affidavits (and exhibits in support thereof) of Defendant; Plaintiff; Robert New, Chief Executive Officer of New Forensic Technologies; Joel Codiamat, a photographer; Dr. Thomas Epps, a physician who has been treating Plaintiff; Brentley Kellum, Technical Director of Central Virginia United Soccer ("CVUS"); Pierre Mortemousque, President of CVUS; Susan Larson, a CVUS board member; and G. Frank Riley, a paralegal employed by Defendant's counsel. The parties have taken no depositions. Defendant's reply to Plaintiff's opposition is submitted with the "Declaration of Melisa Loewe," the "Executive Director of the Washington School of Photography in Rockville, Maryland," and Defendant has designated her as an expert. *See* docket no. 51. However, Ms. Loewe's testimony cannot be admitted as "Testimony by Expert Witness" under Rule 702 of the Federal Rules of Evidence because she is not "qualified as an expert by knowledge, skill, experience, training, or education." Ms. Loewe's "Biography," which her affidavit describes as a "curriculum vitae," is attached to her declaration. The "Biography" is the only documentation submitted in support of Ms. Loewe's affidavit, which states that she "holds a law degree and Master's degree in business, which uniquely qualifies her to speak to photographers about copyright, business formation, contracts, and model releases." However, merely holding a law degree does not qualify one to render a legal opinion regarding a purported contract (and there is nothing in her biographical information indicating that she is authorized, as a member of a state bar, to render any legal advice regarding "copyright, business formation, contracts, and model releases"). Indeed, the "Biography" provides such scant information that it fails even to indicate when and where she earned any educational degrees. In any event, the court determines questions of law, and Ms. Loewe's personal "opinion" that "Mr. Lawidjaja's releases are well within industry standards" is just that: Ms. Loewe's personal opinion. *See Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 359-60 (D. Mass. 2008) (regarding model release, expert not permitted to testify as to "inadmissible conclusions of law"). As for Ms. Loewe's opinions regarding Defendant's "method of keywording images as they are being made," there is nothing in her biographical information to suggest that she has any technological expertise, the declaration and the supporting biographical information do not indicate that she has ever rendered an expert opinion of any sort (relevant or not relevant to the issues in this case), and her declaration clearly states that it conveys information given to her by Defendant. And, as disclosed in my review of the summary judgment record, Plaintiff's expert, Mr. New, offers credible testimony that absolutely refutes Defendant's self-serving description of how and when his photographs of Plaintiff were tagged with certain keywords.

Virginia. Plaintiff signed a model's release presented to him by Mr. Codiamat. The release did not include any mention or consent to pose in the nude. During Plaintiff's first session with Mr. Codiamat, no pictures were taken of him posing in the nude. However, at a subsequent session, Mr. Codiamat showed Plaintiff photos of models in a magazine, and told Plaintiff he wanted to photograph him in similar poses. Mr. Codiamat's affidavit states that, when he asked Plaintiff to pose nude, Plaintiff "was reluctant," and asked Mr. Codiamat "to promise not to publish nude photographs of him in any publication." Mr. Codiamat gave that promise, and relying on that promise, Plaintiff posed nude for Mr. Codiamat, who has never published nude photographs of Plaintiff. The release Plaintiff signed for Mr. Codiamat is similar to the release presented to Plaintiff by Defendant, including a release of any claim for libel, but it differs in many small ways and in one very significant way, in that it describes the "consideration" as "consideration of [Plaintiff's] engagement as a model[.]"

Mr. Codiamat's affidavit adds the following statement: "In December 2012, I saw for the first time nude photographs of Mr. Tharpe on Rudy's website rudykphotography.com and I called Mr. Tharpe and told him what I had seen."

In August 2011, Plaintiff learned that a board member of another soccer club in Forest, Virginia, which was forming a partnership with CVUS, had conducted an Internet search using Plaintiff's name and discovered photographs of which the board member did not approve. These photographs had been posted by Defendant. Reacting to the posting of the photographs, Plaintiff immediately asked Defendant to take down the photos. Defendant agreed to take down some of the photographs from Plaintiff's website, but left on the site a photo that was still objectionable to the Forest soccer club board member. The president of CVUS, Pierre Mortemousque, and a CVUS board member, Susan L. Larson, saw the photos. There were no photographs of Plaintiff

in the nude, and they did not find the photos objectionable.

E-mail exchanges between the parties in October 2011 support Plaintiff's allegation that he did not consent to the distribution of nude photogrpahs that Defendant had made of Plaintiff. These e-mails indicate that that Defendant "coukdnt [*sic*] care less" about nude photographs of Plaintiff "as long as u can do the body pose with clothes," and could support a reasonable fact-finder's conclusion that, as Plaintiff alleges, the parties had made a verbal agreement regarding the nude photographs, regardless of the model's releases that Plaintiff signed.[26]

Plaintiff signed a new release in October 2011 and, sometime thereafter, became suspicious that Defendant has placed "spyware" on Plaintiff's cell phone. There is evidence in the record that, on several occasions, Defendant had control of Plaintiff's various cellular phones. There is also evidence to support the conclusions that Defendant uploaded files from at least one of Plaintiff's cellular phones without Plaintiff's permission and that Defendant attempted to persuade Plaintiff to surrender his iPhone in favor of another cellular phone of Defendant's choosing. And, according to Defendant's own statements, Defendant gave several cellular phones to Plaintiff.

Plaintiff's expert, Robert New, the Chief Executive Officer and co-founder of New Forensic Technologies ("NFT"), has submitted an affidavit stating, *inter alia*, that spyware had been placed on Plaintiff's cell phone. I quote Mr. New's affidavit, in pertinent part (paragraph numbering omitted):

---

[26] The record is abundant with such exchanges that support a conclusion that the parties had made such an agreement. For example, in a text message exchange from January 12, 2012, Plaintiff denied asking "anyone to google" Defendant's Web-site or Plaintiff's pictures, and inquired, "May I ask why you have released those photos even after our discussions of never releasing full nude photos?" Defendant did not deny such discussions. Rather, Defendant gave the following responses: "Instead it makes my sites more popular than ever and will help me greatly in court :)"; and "up in the ranking will help u all in court?"

NFT is a company which provides digital forensic technology services, such as computer and network forensics, data analysis, and data recovery, to attorneys, businesses and corporations, polic, prosecutors, courts, private investigators, insurance companies, accountants, fraud examiners, auditors, and victims of computer crimes or torts. . . .

Prior to establishing NFT I had over a decade of experience in the law enforcement field, with my primary focus being on cyber crimes.

I was the Director of the Central Virginia Computer Crimes Task Force, and have successfully examined and prosecuted hundreds of cyber crimes cases.

I have the following certifications Aas, NITRO, BDRA, ADRA, CFI, ACFI, P2P Marchal Forensics, MAC Marshal Forensics, P2P ARES, CPS, Certified DCJS Instructor, Developer of Cyber 101, Cyber 201, and Advanced Network Forensic Training.

I was recently retained by [Plaintiff] to conduct a forensic analysis of his cellular phone to determine whether spyware had been installed on said phone, and to provide other opinions with regard to the defendant's web activity and modifications/tagging of certain photographs. I have outlined my findings/opinions below.

## FORENSIC ANALYSIS OF CELLULAR PHONE

The Plaintiff delivered one SAMSUNG Galaxy S Model SCH-1500 cellular phone (the "Phone") to me on February 15, 2013. . . . I created a forensic image of the Phone on February 16, 2013, which I then analyzed searching for all known types of spyware and key loggers. . . .

While analyzing the Phone, I found one launcher file. Signatures found in the file suggest that the file was commercially marketed software made by Spectorsoft. The specific product was either eBlaster or Spector Pro. The Phone was not active on a cellular network, so the software was not capable of transmitting any date at the time the Phone was analyzed.

eBlaster and Spector Pro are very similar products, the main difference between the products is that eBlaster is designed for remote installations and reports of activity to be delivered by email, whereas Spector Pro is designed for someone who has physical access to the monitored device to review the reports.

The main function of these products is to record all user activity such as screenshots, emails, instant messages, etc., and then to send a report of that activity via email.

In summary, I found that spyware had been placed on the phone, however, I could not determine who placed the spyware on the phone.

## DEFENDANT'S WEB ACTIVITY/ARCHIVE.ORG

Using Archive.org's Wayback Machine I examined several of the defendant's websites, including rudykphotography.com, jimmytharpe.come, jimmytharpe.net, and jtharpe.com.

Archive.org is an Internet Archive (the "Internet Archive") founded by Brewster Kahle in 1996. Specifically, it is a digital library that provides permanent storage of and free public access to collections of digitized materials, including websites, music, moving images, and nearly three million public-domain books.

In 1996, the Internet Archive began to archive and preserve the World Wide Web, but this information was not made publicly available until it developed the Wayback Machine in 2001. The Wayback Machine allows users to view archived webpages and their content as they existed at any given point.

The Internet Archive uses, among its other tools, a WebCrawler to collect its data. A WebCrawler is an internet bot, which systematically browses the World Wide Web, typically for the purpose of web indexing. The data retrieved for the Internet Archive is stored on servers and indexed to make that information searchable by the public using the Wayback Machine.

Over my 18 year career, I have used Archive.org hundreds of times. It is a great timeline tool, which can show the progression of websites from their creation to the present day.

I have found the content to be accurate for the time the "snapshot" of the website was captured by the WebCrawler.

As an added precaution, I have checked the accuracy of the information I found on Archive.org against my company's own website, www.NETFORENSIC.com. Prior to drafting this affidavit, I selected two captures of our website from Archive.org. The first selected was from June 2011, shortly after our site was reformatted, and the second was from June 2013, and both appeared to be accurate. . . .

As I have stated previously, I examined several of the defendant's websites using the Wayback Machine located at Archive.org. Below are examples of what I found:

a. A snapshot of the website jimmytharpe.com on April 2, 2012

revealed naked photographs of the plaintiff and specifically listed him as "residing in Lynchburg, Virginia and working as Director of Academy & Recreation at Central Virginia United Soccer Club." . . .

b.    I looked at two snapshots of a blog entry on rudykphotography.com dated November 4, 2010. The first snapshot was taken on February 16, 2011, and has an unknown model as the main photograph and the following tags specifically referencing the plaintiff, "James Tharpe" and "jimmy." The second snapshot was taken on December 28, 2011. The main photograph on the second snapshot is of the plaintiff and shows his full genitalia. In addition, the tags specifically referencing the plaintiff were changed to, "James Tharpe," "jimmy," "Central Virginia United Soccer," "jimmy tharpe," "Lynchburg," and "Soccer." . . .

c.    I looked at two snapshots of a blog entry on rudykphotography.com dated November 22, 2010. The first snapshot was taken on February 15, 2011. The main photograph on the first snapshot is of the plaintiff and it is cropped at the waist, and does not show the plaintiff's genitalia. The tags on the first snapshot that specifically refer to the plaintiff are as follows "James Tharpe" and "jimmy." The second snapshot was taken on December 28, 2011. The main photograph on the second snapshot is still the plaintiff, but it has been expanded to show the plaintiff's genitalia. In addition, the tags specifically referencing the plaintiff had been changed to, "James Tharpe," "jimmy," "Central Virginia United," "jimmy tharpe," and "Soccer." . . .

d.    I looked at a snapshot of a blog entry on rudykphotography.com dated June 24, 2010. The snapshot was taken on December 28, 2011, and is entitled "Jimmy Tharpe I'm not that Innocent." In that entry, the following caption appears under the plaintiff's pictures "Jimmy Tharpe, a Soccer Coach/Director at Central Virginia United Lynchburg." In addition, the blog contained the following tags specifically referencing the plaintiff, "James Tharpe," "Central Virginia United," "jimmy tharpe," and "Soccer." . . .

In summary, Archive.org revealed that changes were made the [*sic*] several of the defendant's websites, which revealed the plaintiff's genitalia and increased the number of specificity of the tags referencing the plaintiff. In addition, the defendant specifically identified the plaintiff's employer in both blog entries and tags.

## TAGGING OF DIGITAL IMAGES

      In my experience, Digital Cameras are only capable of automatically embedding certain information, such as the date the photograph was taken, camera type, lens type, and, if GPS is enabled, latitude and longitude.

      More specific tags would be the result of input by the photographer/photo editor; and any changes to those tags would also be the result of input by the photographer/photo editor.

At the least, Mr. New's affidavit is evidence that could support a reasonable fact-finder's conclusion that, contrary to Defendant's assertion, Defendant in fact tagged photographs of Plaintiff with specific references to Plaintiff's employer, and later changed the references slightly, *e.g.*, from "Central Virginia United Soccer" to "Central Virginia, United States" and "Soccer," in an attempt to claim that the tags were only geographic or sports-oriented.

On February 2, 2012, Plaintiff was fired by the Roanoke Star Soccer Club as the coach of a select team. Plaintiff lost the $1,000.00 fee he would have earned in this position. Plaintiff was fired because of nude photographs Defendant had posted, and because Defendant threatened to take legal action against the Roanoke Star Soccer Club because people associated with the club were allegedly "illegally" downloading photographs of Plaintiff that Defendant had made publicly available.

On February 8, 2012, Plaintiff was put on a one-week leave of absence from CVUS while the matter was reviewed, but he was reinstated. Also on February 8, 2012, Defendant sent Plaintiff a series of text messages, wherein Defendant stated that he hoped Plaintiff would lose his job, so that "nobody win[s]." Defendant also apologized for "threatening to put the pictures back up." Plaintiff has been passed over for a promotion and a substantial pay raise (from $24,000 to $50,000) by CVUS because of the CVUS's reservations about the controversy between Plaintiff and Defendant. According to a past president of CVUS, "[i]t appeared . . . that

the defendant clearly was doing everything he could to get [Plaintiff] fired," but after initially suspending Plaintiff from his duties with CVUS, and "[a]ter giving it some thought, CVUS decided as an organization that it was more important to defend our values and principles instead of letting the defendant ruin [Plaintiff's] life and aspirations at CVUS."  At one point, that past president of CVUS was contacted by Defendant, and he asked Defendant "why he was messing with [Plaintiff] in this way and asking him to 'man up,'" and he asked Defendant "what he meant by man up."  The past president attests that "[t]he defendant told me that he wanted [Plaintiff] to do things for him like volunteering for gay and lesbian organizations."

In March 2012, after Plaintiff had informed Defendant that he would not speak with him or negotiate with him any further, Defendant created three websites in plaintiff's name: jimmytharpe.com, jimmytharpe.net, and jtharpe.com, and Defendant had posted faked erotic photos of Plaintiff on these websites and on a gay-oriented website, art4thecause.com.  These faked photos showed plaintiff with erections and ejaculations.  Defendant also communicated threats to Plaintiff that Defendant would continue to post more photos if Plaintiff did not "man up" and accede to Defendant's various demands (including, apparently, that Plaintiff leave Lynchburg, quit coaching soccer, resume modeling for Defendant, and trade his iPhone for an Android or other cellular phone model of Defendant's choice).  Defendant also threatened to publish the photos in a gay-themed magazine, *The Male Form*, that would be distributed nationwide that April.  According to Plaintiff, Defendant made good on these threats, even referring to Plaintiff as a "porn star" on one of the Web-sites.

Since March, 2012, Plaintiff has been under the treatment of a physician, Dr. Thomas Eppes, of Lynchburg, who has been treating him for panic attacks and anxiety (Plaintiff's symptoms of which have included palpitations, shortness of breath, choking, and shingles).  Dr.

Eppes' opinion, expressed in an affidavit in support of Plaintiff's opposition to the motion for summary judgment, is that Plaintiff's anxiety and stress are related to his distress over Defendant's persecution of him and the threats to Plaintiff's employment.

## 2. Defendant's Motion for Summary Judgment

### a. The "Model Releases"

A "model release" is a liability waiver or exculpatory agreement typically signed by the subject of a photograph granting permission to publish or sell the photograph in one form or another. *See* Dan Heller, A Digital Photographer's Guide to Model Releases: Making the Best Business Decisions with Your Photos of People, Places and Things 51 (2008); *see also* http://en.wikipedia.org/wiki/Model_release (last accessed March 22, 2014). Defendant raises the model releases signed by Plaintiff as a pre-emptive defense, asserting that the releases are contracts that permit Defendant to use the photographs in any way he chooses. Assuming for the moment that the releases are to some (or to any) extent enforceable, Defendant misses the point: The crux of the complaint is that Defendant maliciously intermeddled in Plaintiff's personal life in an attempt to affect, *inter alia*, Plaintiff's employment and emotional well-being, and there is evidence in the record to support a reasonable fact-finder's determination that Defendant did so.[27]  Moreover, as discussed below, the releases are not enforceable as contracts and, even if they were, there is evidence in the record to support a reasonable fact-finder's conclusion that the parties agreed that Defendant would not distribute photographs of Plaintiff that exposed him below the waist.

---

[27] Whether Defendant used the photographs he took of Plaintiff to accomplish his goal of interfering in Plaintiff's life is beside the point. Whatever the releases ultimately permit, they no more permit Defendant to use the photos to harass Plaintiff than they permit Defendant to take a sheaf of them and bludgeon Plaintiff senseless. The analogy may seem hyperbolic, but it is absolutely apt, for that is the essence of Defendant's interpretation of the releases.

The model releases signed by Plaintiff on March 18, 2010, and October 14, 2011, are nearly identical and state the following (an addition to the October 2011 release is bracketed):

RELEASE

For valuable consideration received, I hereby grant to Rudy K ("Photographer") the absolute and irrevocable right and unrestricted permission in respect of photographic portraits or pictures [or video or motion pictures] that he/she had taken of me or in which I may be included with others, to use, reuse, publish, and republish the same in whole or in part, individually or in any and all media now or hereafter known, and for any purpose whatsoever, for illustration, promotion, art, editorial, advertising, and trade, or any other purpose whatsoever without restriction as to alteration; and to use my name in connection therewith if he/she so chooses. I hereby release and discharge Photographer from any and all claims and demands arising out of or in connection with the use of the photographs, including without limitation any and all claims for libel or violation of any right of publicity or privacy.

This authorization and release shall also inure to the benefit of the heirs, legal representatives, licensees, and assigns of Photographer, as well as the person(s) for whom he/she took the photographs.

Upon a finding by a court of competent jurisdiction that any provision of this release is illegal, unenforceable or invalid, I agree to execute a photo release that is legal and enforceable.

I am of full age and have the right to contract in my own name. I have read the foregoing and fully understand the contents thereof. This release shall be binding upon me and my heirs, legal representatives, and assigns.

The first release adds that "[t]his Agreement applies to all photographs taken of my person on or between the following dates: Friday January 1st 2010 and Monday December 31st 2012," and the second release adds that "[t]his Agreement applies to all photographs or videos taken of my person on or between the following dates: August 15th 2011 and December 31st 2015."

According to Defendant, the releases are contracts. In Virginia, it is well-established that the nature, validity, and interpretation of a contract is governed by the "law of the place where made." *Lexie v. State Farm Mut. Auto. Ins. Co.*, 251 Va. 390, 394 (1996) (citations omitted). A

contract is made "when the last act to complete it is performed." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005). However, when "a contract is made in one jurisdiction but performed in another, the law of the place of performance governs the contract." *Hunter Innovations Co. v. Travelers Indem. Co. of Conn.*, 753 F. Supp. 597, 603 (E.D. Va. 2010) (citing *Erie Ins. Exch. v. Shapiro*, 248 Va. 638, 640 (1994)). Importantly, an exception exists when the contract is to be performed more or less equally among two or more states, in which case the law of the state in which the contract was made should apply. *See Roberts v. Aetna Casualty & Sur. Co.*, 687 F. Supp. 239, 241 (W.D. Va. 1988); *see also Black v. Powers*, 48 Va. App. 113, 132–33 (2006) (applying the law of the Virgin Islands, where the contract was made and partially performed).

Plaintiff does not dispute Defendant's assertions that the first release was executed in Maryland, the second release was executed in the District of Columbia, and any alleged contractual "performance" that occurred pursuant to the releases took place in Maryland, Virginia, and the District of Columbia (and possibly New York). Accordingly, the interpretation of the first release is governed by the law of Maryland, and the second release is interpreted under the law of the District of Columbia.[28]

### i. Exculpatory Agreements in Maryland

Under Maryland law, "[a]n exculpatory clause is a 'contractual provision relieving a party from liability resulting from a negligent or wrongful act.'" *BJ's Wholesale Club, Inc. v. Rosen*, 435 Md. 714, 80 A.3d 345, 351 (2013) (quoting BLACK'S LAW DICTIONARY (9th ed. 2009)). The Court of Appeals of Maryland has acknowledged that, in a general sense,

---

[28] Neither of the parties properly addresses the applicable legal frameworks within which Plaintiff's claims and the arguments in Defendant's motion must be analyzed.

exculpatory clauses are permitted in Maryland, but it has also "recognized that there [are] circumstances in which enforcement of an exculpatory clause could be precluded, the first . . . being" that "'a party *will not be permitted to excuse its liability for intentional harms* or for the more extreme forms of negligence, *i.e.*, reckless, wanton, or gross.'" *Id*. (quoting *Winterstein v. Wilcom*, 16 Md. App. 130, 136, 293 A.2d 821, 824 (1972) (citing Restatement (Second) of Contracts § 195(1) (1981); W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 68, at 482 (5th ed. 1984)) (emphasis added).

Accordingly, under Maryland law the first model release does not excuse or permit Defendant's liability for Plaintiff's claims of intentional harms.[29]

ii. Exculpatory Agreements in the District of Columbia

As in Maryland, the law of the District of Columbia generally permits exculpatory clauses, but not if they purport to waive liability for gross negligence, fraud, or other intentional wrongful conduct. *See Carleton v. Winter*, 901 A.2d 174, 181 (D.C. 2006). Accordingly, the

---

[29] In the alternative, the model release is unenforceable for a lack of consideration. Under Maryland law, a legally binding contract must be supported by sufficient consideration. *See Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 378 Md. 139, 147 (2003). The record, a thorough review of which I have presented in this opinion, shows that there was no consideration for Plaintiff's services. The only thing that could possibly have been construed as consideration is a "time for print" arrangement, where the model receives photographs to use to promote himself as a model. *See* Roderick Macdonald, Mastering Digital Nude Photography 122, 125 (2006); Roshumba Williams & Anne Marie O'Connor, The Complete Idiot's Guide to Being a Model 174-183 (1999); *see also* http://en.wikipedia.org/wiki/Time_for_print (last accessed March 22, 2014). In this case, Defendant took back the "gifts" he had "given" to Plaintiff, and he unilaterally revoked Plaintiff's license to use the photographs. The model release does not specify any consideration whatsoever, other than stating "[f]or valuable consideration received," and the record does not reflect that Plaintiff received any consideration. If Plaintiff received consideration that was contingent upon his continued compliance with Defendant's demands, that contingency would need to be spelled out in the agreement. *See Goldstein v. Miles*, 159 Md. App. 403, 431, 859 A.2d 313, 329 (2004) (for a promise to establish an enforceable contract, it must express with definiteness and certainty the nature and extent of the parties' obligations; indefiniteness and uncertainty as to any of the essential terms of an agreement may prevent the creation of an enforceable contract). The indefinite, uncertain, and illusory nature of the model releases signed by Plaintiff is underscored by the following provision: "Upon a finding by a court of competent jurisdiction that any provision of this release is illegal, unenforceable or invalid, I agree to execute a photo release that is legal and enforceable." That provision amounts to nothing more than an unenforceable "agreement to agree." *See Horsey v. Horsey*, 329 Md. 392, 420, 620 A.2d 305, 319 (1993) (discussing unenforceability of agreements to agree).

second model release does not excuse or permit Defendant's liability for Plaintiff's claims of intentional harms.

### b. Fraud

Regarding Plaintiff's claim that he was fraudulently induced into signing the releases by Defendant's promises that he would not distribute nude photographs displaying Plaintiff's genitalia, the parties do not address the question of which jurisdiction's law to apply. Indeed, Defendant's main argument is that such a claim is waived by the exculpatory clause in the model release; however, as I just discussed, the exculpatory clauses in the releases are unenforceable, given that fraud in the inducement is an intentional tort. *See Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 452, 56 A.3d 631, 660 (2012) (fraud in the inducement is an intentional tort); *In re Estate of McKenney*, 953 A.2d 336, 341-42 (D.C. 2008) (same); *Abi-Najm v. Concord Condominium, LLC*, 280 Va. 350, 362-63, 699 S.E.2d 483, 489-90 (2010) (same).

Moreover, the record, reviewed above, could support a reasonable fact-finder's determination that Defendant fraudulently induced Plaintiff into posing nude.[30] *See Dynacorp*, 208 Md. App. at 452, 56 A.3d at 660 (quoting *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 134, 838 A.2d 404 (2003), *cert. denied*, 380 Md. 619, 846 A.2d 402 (2004)) (setting forth elements of fraudulent inducement in Maryland); *In re Estate of*

---

[30] Among other things, the evidence includes much correspondence between the parties (and others, such as Arnold Lutzker, a lawyer representing Defendant at the time, but not in the matter) where Plaintiff discusses an agreement between the parties that Defendant would not distribute photographs depicting Plaintiff's genitals and buttocks. That correspondence indicates that Defendant never denied that agreement, but only insisted that he had a legal right to do as he wished with full-frontal nude photographs of Plaintiff, and Defendant taunted Plaintiff that he would disclose more full-frontal nude photographs if Plaintiff did not do as Defendant wished. Because of the evidence supporting Plaintiff's allegations of fraud regarding that agreement, Defendant's motion for summary judgment on Plaintiff's request for cancellation and rescission must fail. Additionally, although Defendant states that the request for cancellation and rescission must fail because Defendant "did not abuse the contracts, either to interfere with Plaintiff's employment contract or to humiliate Plaintiff," the record could support a reasonable fact-finder's conclusion that he did just that.

*McKenney*, 953 A.2d at 342 (quoting *Park v. Sandwich Chef*, 651 A.2d 798, 801, 802 n. 3 (D.C. 1994) (reviewing elements of fraud in the inducement claim in the District of Columbia); *George Robberecht Seafood, Inc. v. Maitland Bros. Co., Inc.*, 220 Va. 109, 111-12, 255 S.E.2d 682, 683-84 (1979) (reviewing elements of fraud in the inducement claim in Virginia); *see also Jordan v. Walker*, 115 Va. 109, 117, 78 S.E. 643, 644-45 (1913); *Abi-Najm*, 280 Va. at 362-63, 699 S.E.2d at 489-90.

### c. Intentional Infliction of Emotional Distress

In order to successfully bring a claim of intentional infliction of emotional distress ("IIED"), a plaintiff must satisfy four elements of proof. "The plaintiff must show that 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Supervalu, Inc., et al. v. Johnson*, 276 Va. 356, 666 S.E.2d 335, 343 (2008) (citations omitted). "[T]he tort of intentional infliction of emotional distress is 'not favored' in the law, because there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury." *Id*. (citations omitted). Here, however, Plaintiff the record contains "sufficient" "clear and convincing evidence" upon which a reasonable finder of fact could determined that he had proved his case. *Id*. at 343-44 (IIED requires sufficiency of evidence of "conduct intended to cause personal, emotional damage to an individual, rather than conduct intended to cause economic damage to a business") (citing *Luddeke v. Amana Refrigeration, Inc.*, 239 Va. 203, 207, 387 S.E.2d 502, 504 (1990) (IIED is an action for personal injury)); *see also Russo v. White*, 241 Va. 23, 26, 400 S.E.2d 160, 162 (1991) (clear and convincing evidence standard); *Ruth v. Fletcher*, 237 Va. 366, 373, 377 S.E.2d 412, 416 (1989) (same).

i. Intent

The element of intent requires that a defendant must have engaged in conduct for the specific purpose of causing emotional distress to the victim. *See Almy v. Grisham*, 273 Va. 68, 639 S.E.2d 182, 187 (2007). An individual may also inflict emotional distress recklessly if he takes an action without regard to the risk of causing emotional distress to a victim when he knew or could have been expected to know of the risk. *See Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 523 S.E.2d 826, 833 (2000).

Here, the record supports a finding of Defendant's specific intent to cause emotional distress to Plaintiff, given Defendant's assertion that the exculpatory clauses in the releases gave him a "legal right" to use the photographs "for any purpose whatsoever." Indeed, Defendant's own statements reflect his intent. Plaintiff was plainly upset by Defendant's conduct, and when Plaintiff sent quite reasonable communications to Defendant regarding his conduct, Defendant sent responses to Plaintiff such as an e-mail stating, "You have been warned if you stand in the middle of the street you gonna get hit by a truck." In a letter, Defendant stated that he would exercise "nuclear options," and he sent Plaintiff text messages and e-mails that included the following statements:

- "Maybe when you lost ur job and move out of lynchburg good for everyone. That way nobody win." (Bracketed insertions added; otherwise verbatim.) When Plaintiff responded, "That is fucked up that you want me to lose my job," Defendant replied, "Lost, quit, move or whateveru call it. so nobody win." (Verbatim quote.)

- "Mark my word, even after google finish clearing the cache and cvu still letting u go, u gonna react differently."

- "It is now your responsibility to arrange propositions that will entice me into agreement. I refuse to continue in any further discussions with you concerning your pictures until these conditions are met and your obligation fulfilled."

I add that a reasonable finder of fact could conclude that Defendant's denials that he posted photographs and intentionally tagged them with identifiers to direct them to Plaintiff's place of employment are discredited by Plaintiff's expert's statement and the evidence submitted in support thereof. Defendant otherwise admits that he posted full-frontal nude photographs of Plaintiff on the Internet, and the record reflects that he taunted Plaintiff with threats to post more full-frontal nude photographs if Plaintiff did not accede to his various demands.

### ii. Outrageousness

"[T]he term 'outrageous' does not objectively describe particular acts but instead represents an evaluation of behavior." *Almy*, 639 S.E.2d at 187. The behavior in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quotations omitted). The conduct in question must rise above the level of being merely "insensitive and demeaning." *See Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24, 34 (2006).

Defendant argues that his conduct was not outrageous because he exercised the license granted to him in the releases. However, as discussed above, the releases do not grant Defendant a license to commit intentional acts against Plaintiff, and the record could support a reasonable fact-finder's conclusion that Defendant's actions in posting and distributing the photographs and tagging them with personal identifiers and defamatory statements, *e.g.*, identifying photographs of Plaintiff as a "porn star," was outrageous. This was not a case of mere verbal abuse or insensitive conduct. *See Harris*, 624 S.E.2d at 34. Indeed, the context of Defendant's conduct is that Defendant's conduct was not only outrageous, but that he deliberately conducted himself in that outrageous manner because he believed the unenforceable exculpatory waivers in the releases granted him *carte blanche* to do so, and that he could not be held accountable, no matter

how outrageous his behavior, and that he could coerce Plaintiff into acquiescing to his various demands, including to continue modeling for him. Thus, a reasonable finder of fact could conclude that Defendant's conduct amounts to outrageous conduct that is "utterly intolerable in a civilized community." *Harris*, 624 S.E.2d at 34.

### iii. Causation

To satisfy the element of causation, Plaintiff must show that Defendant's outrageous conduct was the actual cause of the distress. *See Almy*, 639 S.E.2d at 187–88. Plaintiff alleges that he suffered emotional distress and that Defendant's conduct was the cause of the emotional distress, and there is sufficient evidence in the record to support a reasonable fact-finder's conclusion that Defendant's conduct caused the emotional distress.

### iv. Severity

Finally, to sustain an IIED claim, the emotional distress allegedly caused by Defendant's outrageous conduct must have been severe. *See Supervalu*, 666 S.E.2d at 343. The requisite emotional distress must be "the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163; *see also Harris*, 624 S.E.2d at 34. In *Hatfill v. New York Times Co.*, 416 F.3d 320 (4th Cir. 2005), the United States Court of Appeals for the Fourth Circuit held that a plaintiff had sufficiently pleaded the necessary element of "severe emotional distress" where he had alleged "severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, severe emotional distress and other injury, and grievous emotional distress." 416 F.3d at 337. Plaintiff has not only alleged these facts; he has made an evidentiary showing in support of those facts upon which a reasonable finder of fact could conclude that the emotional distress he has suffered is severe.

*d. Tortious Interference*

As discussed above regarding Defendant's counter-claim for tortious interference, in order for Plaintiff to state a claim for tortious interference with a contract, Plaintiff must show that (1) he had a valid contractual relationship; (2) Defendant knew of the relationship; (3) Defendant intentionally interfered, inducing or causing a breach or termination of the relationship; and (4) Plaintiff suffered a loss as a result of Defendant's disruption of the relationship. *Maximus, Inc.*, *supra*, 493 S.E.2d at 378. The elements for tortious interference with a business expectancy are more-or-less the same, except Defendant must demonstrate in addition to the first element "a probability of future economic benefit" and in lieu of the third element "a reasonable certainty that absent [Defendant's] *intentional misconduct*, [Plaintiff] would have . . . realized the expectancy." *Commercial Bus. Sys., Inc.*, *supra*, 484 S.E.2d at 896 (citation omitted) (emphasis added).

Here, Plaintiff states that he has an at-will contract with CVUS. However, "[a]s the Supreme Court of Virginia has held, 'the cause of action for interference with contractual rights provides no protection from the mere intentional interference with a contract terminable at will.'" *Frank Brunckhorst Co., supra*, 542 F. Supp. 2d at 463 (citing *Duggin*, *supra*, 234 Va. At 227, 360 S.E.2d 832). Nonetheless, because "it is clear that any such action would be identical with a claim for tortious interference with business expectancy," Plaintiff's claim is analyzed as one for tortious interference with business expectancy. *Id.*

It is undisputed that Plaintiff had valid at-will contracts with CVUS and with the Roanoke Star, and that Defendant knew of the relationships. *Maximus, Inc.*, 493 S.E.2d at 378. Additionally, the record could support a determination that Plaintiff has suffered losses as a result of the disruption, as when he lost his fee for coaching the Roanoke Star and was denied a

raise of double his present salary at CVUS.  *Id.*  Indeed, this latter factual determination supports the required showing of "a *probability* of future economic benefit."  *Commercial Bus. Sys., Inc.*, 484 S.E.2d at 896 (citation omitted) (emphasis added).  Most importantly, instead of the third element of a claim for tortious interference with a contract, *i.e.*, a showing that Defendant *intentionally interfered*, inducing or causing a breach or termination of the relationship, *see Maximus, Inc.*, 493 S.E.2d at 378, a claim of tortious interference with a business expectancy requires showing "a reasonable certainty that absent [Plaintiff's] *intentional misconduct*, [Defendant] would have . . . realized the expectancy."  *Commercial Bus. Sys., Inc.*, 484 S.E.2d at 896 (citation omitted) (emphasis added).  And Plaintiff makes that showing.

As previously discussed, "intentional misconduct" under Virginia's tort of intentional interference requires "[i]mproper methods or means," which "generally involve violence, threats, intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition."  *Preferred Sys. Solutions, Inc.*, *supra*, 732 S.E.2d at 688; *see also Frank Brunckhorst Co., L.L.C.*, 542 F. Supp. 2d at 464 (quoting *Duggin*, 234 Va. at 227, 360 S.E.2d at ___) ("The Virginia Supreme Court has explained that '[m]ethods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. . . .  Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct.'").

The evidentiary record could support a reasonable fact-finder's determination that Defendant has engaged in "threats," "intimidation," "unfounded litigation," "fraud,

misrepresentation or deceit," "defamation" (discussed below), "duress," "misuse of inside or confidential information," the "violation of an established standard of a trade or profession," and "unethical conduct." *Preferred Sys. Solutions, Inc.*, 732 S.E.2d at 688. And, the record supports a conclusion that, absent Defendant's misconduct, Plaintiff would have realized the expectancy of a doubled salary. *See Commercial Bus. Sys., Inc.*, 484 S.E.2d at 896 (citation omitted) (emphasis added).

### d. Defamation

Under Virginia law, a claim of defamation requires a "(1) publication of (2) an actionable statement with (3) the requisite intent." *Jordan v. Kollman*, 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005). A statement is not actionable merely because it is false; it must also be defamatory, meaning it must "tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (quoting Restatement (Second) of Torts § 559); *Jordan*, 269 Va. at 575, 612 S.E.2d at 206. If a statement is true, however, or substantially accurate, there can be no action for defamation. *Jordan*, 269 Va. at 575, 612 S.E.2d at 206; *Saleeby v. Free Press, Inc.*, 197 Va. 761, 762-63, 91 S.E.2d 405, 407 (1956). Further, statements of opinion are ordinarily not defamatory because such statements cannot be objectively classified as true or false. *Jordan*, 269 Va. at 575-76, 612 S.E.2d at 206. As for the requisite intent required, the defendant may be found liable if the defendant knew the statement to be false or negligently failed to ascertain whether the statement was false. *Gazette, Inc. v. Harris*, 229 Va. 1, 15, 325 S.E.2d 713, 725 (1985).

A photograph can constitute a defamatory statement. *Peck v. Tribune Co.*, 214 U.S. 185, 188 (1909); *see also White v. Nicholls*, 44 U.S. 266, 291 (1845) ("[E]very publication, either by

writing, printing, or pictures, which charges upon or imputes to any person that which renders him liable to punishment, or which is calculated to make him infamous, or odious, or ridiculous, is *prima facie* a libel, and implies malice in the author and publisher towards the person concerning whom such publication is made.").

The law in Virginia for determining whether a statement is defamatory requires "the potential defamatory meaning of statements [to] be considered in light of the plain and ordinary meaning of the words used in context as the community would naturally understand them." *Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999), *cert. denied*, 528 U.S. 1118 (2000). A defamatory charge may be express or implicit. *Carwile v. Richmond Newspapers*, 196 Va. 1, 7, 82 S.E.2d 588, 592 (1954) (noting that defamation "may be made by inference, implication or insinuation"). Thus, the court must look not only to the actual statements, but also to all inferences fairly attributable to them. *Wells*, 186 F .3d at 523.

Here, the record reflects that Defendant distributed photographs in which Plaintiff was identified as a "porn star," and Defendant distributed photographs that he had altered to depict Plaintiff in a state of tumescence and as having ejaculated for the camera, and he tagged these and other full-frontal nude photographs of Plaintiff with identifiers to link the photographs to Plaintiff's place of employment.[31] These statements, taken in the context of their ordinary and common acceptance as the average citizen would understand them, and with every fair inference attributed to the statements, and in the context of the record developed in support of Plaintiff's

---

[31] Again, Defendant's assertion that he had an unfettered "legal right" to do as he wished with the photographs is unfounded, as the exculpatory clauses in the model releases are unenforceable, and Defendant's belief that the model releases granted him the right to commit intentional torts bolsters the conclusion that he did, in fact, intend to commit such torts. And, again, Defendant's continued assertion that he never tagged the photographs with "Central Virginia United Soccer," but instead tagged them "Central Virginia, United States," is simply unbelievable, given the credible evidence in the summary judgment record.

claims, could fairly be determined defamatory under Virginia law.  Indeed, these statements are defamatory *per se*, given that (1) they arguably impute an unfitness for Plaintiff to perform the duties of a youth soccer coach (and Defendant arguably intended to impute that unfitness), and (2) they prejudice Plaintiff in his profession or trade.  *Carwile*, 196 Va. at 7, 82 S.E.2d at 591 (listing the four categories of defamatory words that are actionable without a showing of special damages).

IV.

Plaintiff has moved for the court to set this case for a trial without jury.[32]  Additionally, counsel for Defendant has filed a renewed motion to withdraw.  I will grant Plaintiff's motion to set the matter for trial, and I will deny the motion to withdraw without prejudice.

Counsel's renewed motion states that "[t]he conditions that impelled Counsel originally to move to withdraw and that this Court found to represent good cause for withdrawal substantially remain," that "[t]he representation of Defendant has been rendered unreasonably difficult by virtue of counsels' continuing inability to communicate fully and effectively with Defendant regarding the substance of this action," and that Defendant has failed "substantially to fulfill an obligation to counsel regarding their services as required by the signed retainer agreement between Defendant and the Spirer Law Firm, P.C."  I denied counsel's previous motion "without prejudice to counsel's leave to renew the motion *after a new trial date is set*."  (Emphasis added.)  However, a new trial date has not yet been set.  Accordingly, counsel's

---

[32] When Defendant removed the case here from the Circuit Court for the City of Lynchburg, he clearly indicated that a jury was not demanded.  *See* civil cover sheet, docket no. 1, attachment no. 2.  Additionally, both parties have waived any demands for a jury trial.  *See* docket no. 49.

renewed motion to withdraw will again be denied without prejudice to counsel's leave to renew the motion *after a new trial date is set*.[33]

**V.**

Although Defendant's counsel has renewed counsel's motion to withdraw, counsel has recently filed motions seeking to exclude or limit testimony presented by Plaintiff's physician and expert witness. The motions are not well-founded and not well-taken, and they must be denied.

In the first instance, the motions are not timely filed. Plaintiff's physician was disclosed on January 30, 2013, and Plaintiff's expert was disclosed on August 21, 2013. Defendant's motion for summary judgment was filed on July 11, 2013. On July 1, 2013, the matter was set for trial on November 25, 2013. On November 5, 2013, the trial date was continued, pursuant to Defendant's motion, to a date to be set at a later time. Paragraph 20 of the pretrial order entered in this case on August 2, 2012, provides that "[a]ny motion to exclude the testimony of an expert based on the sufficiency or reliability of the expert's testimony must be filed no later than the deadline for filing motions for summary judgment." *See* docket no. 7. Under paragraph 5 of the pretrial order, that deadline was "no later than 75 days before trial." *Id*.; *see also* W.D. Va. Civ. R. 16, 26(b), 56(a). Regardless of the various continuances and enlargements of time for discovery that have been granted to the parties, the instant motions to exclude or limit testimony are filed far out of time.

---

[33] I note that, as I observed when denying counsel's previous motion, counsel's conduct in continuing to file motions and notices on Defendant's behalf implicitly acknowledges the necessity of this sequence. Indeed, Defendant's counsel most recent filings were submitted on March 21, 2014. At some point, counsel's continued conduct of filing motions while requesting to be removed begins to weigh against granting the motion to withdraw.

Regarding Plaintiff's physician, Defendant argues that Dr. Eppes's curriculum vitae "discloses no specialized training or experience in the field of mental health." However, the document Defendant describes as a curriculum vitae is actually a print-out of an Internet page describing Dr. Eppes's practice at Central Virginia Family Physicians, and is not at all an all-encompassing document. Moreover, the document specifically indicates that Dr. Eppes has some expertise in "Depression/Anxiety and Teenage Health." Accordingly, the motion to exclude Dr. Eppes's testimony fails, although Defendant can challenge the expanse of his expertise, and the scope and admissibility of some or all of his testimony, at trial.

Regarding Plaintiff's expert, Mr. New, Defendant seizes on Mr. New's singular use of the word "suggest" to argue that his conclusion is based on "belief or speculation," and not "scientific, technical, or other specialized knowledge" as required by Rule 702(a) of the Federal Rules of Evidence. The problem with this argument is that it plucks the sentence using the word "suggest" out of context, which is as follows:

> Signatures found in the file *suggest* that the file was commercially marketed software made by Spectorsoft. The *specific product* was either eBlaster or Spector Pro. The phone was not active on a cellular network, so the software was not capable of transmitting any date at the time the Phone was analyzed.
>
> eBlaster and Spector Pro are very similar products, the main difference between the products is that eBlaster is designed for remote installations and reports of activity to be delivered by email, whereas Spector Pro is designed for someone who has physical access to the monitored device to review the reports.
>
> The main function of these products is to record all user activity such as screenshots, emails, instant messages, etc., and then to send a report of that activity via email.
>
> In summary, I found that spyware had been placed on the phone, however, I could not determine who placed the spyware on the phone.

(Emphasis added.) It is difficult to discredit Mr. New's conclusion for one use of the imprecise

word "suggest" when he goes on to provide specific details about the software signatures found on the phone.

Defendant asserts that Mr. New's opinion is not admissible under Rule 401 because it is not "of consequence in determining the action." Fed. R. Evid. 401. However, given the record, which supports Plaintiff's allegations that Defendant possessed Plaintiff's cellular phone, bought cellular phones for Plaintiff, harangued Plaintiff for not using cellular phones of Defendant's choosing, and obtained personal information and electronic files that Plaintiff did not provide to Defendant, Mr. New's opinion that spyware was placed on Plaintiff's cellular phone is relevant.

For the same reasons, Defendant's argument that Mr. New's opinion is unfairly prejudicial under Rule 403 must fail. To be sure, Defendant denies placing spyware on Plaintiff's cellular phone.[34] However, Defendant's own submissions undermine that denial. Moreover, the record raises fair questions. For example: How did Defendant come to possess text-messages and files that Plaintiff sent to a woman he was seeing? Mr. New's testimony is probative of that and other questions and, given the other evidence that is likewise probative of those questions, *e.g.*, Defendant possessed Plaintiff's cellular phone, bought cellular phones for Plaintiff, and harangued Plaintiff for not using cellular phones of Defendant's choosing, the probative value of Mr. New's testimony is not outweighed by unfair prejudice.

---

[34] As Defendant acknowledges, the installation and use of spyware is potentially a criminal act. *See, e.g., United States v. Trout*, 369 F. Appx 493 (4th Cir. 2010) (unpublished) (affirming admission of spyware evidence under Fed. R. Evid. 404(b) where county councilman was convicted under the Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030, and the Electronic Communications Privacy Act, 18 U.S.C.A. § 2511, related to use of spyware; the Court held "that the evidence pertaining to Trout's history with the other council members . . . and other county staff is intertwined with and provided context to Trout's conduct underlying the charges").

**VI.**

For the stated reasons, I will deny Defendant's motion for partial summary judgment, and I will dismiss his counterclaims without prejudice for lack of subject-matter jurisdiction. Defendant's counsel's renewed motion to withdraw will be denied, without prejudice, and Plaintiff's motion to set this case for a bench trial will be granted. Additionally, I will deny Defendant's recent motions, filed by counsel long after filing counsel's renewed motion to withdraw, seeking to exclude or limit testimony presented by Plaintiff's physician and expert witness. An appropriate order accompanies this memorandum opinion.

Entered this ___26th___ day of March, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE